## VICTOR DE LA O *v.* THE PUEBLO OF ACOMA.

Answer Taken as True, When.—When a cause is set down for hearing on the bill, answer, and exhibits, the answer must be taken as true, but may be dissected by the court to determine what it admits or proves.

Finder of Lost Public Document, Rights of.—The finder or other person casually coming to the possession of a public document, paper, or record, gains no such property in it as to authorize him to estimate its value to one having an interest in it, and to withhold the same from the rightful owner or lawful custodian until the estimated sum is paid.

Promise by Owner to Pay for Possession of Document. — Where the finder of a document or title deed refuses to deliver it to the owner until a promise is made by the latter to pay a certain sum therefor, such promise is without consideration and void, and gives the finder no lien upon the document.

Appeal from the district court of the third judicial district for the county of Socorro. The opinion states the case.

*T. D. Wheaton*, for the appellant.

*H. N. Smith*, for the appellee.

By Court, Benedict, J.:

This cause comes by appeal from the chancery side of the United States district court for the county of Socorro, third district. An enactment of the territory authorizes the inhabitants known by the name of pueblo Indians, and living on lands granted to such Indians by the laws of Spain or Mexico, to sue and defend as an incorporation. By virtue of this authority the pueblo of Acoma, by their governor, Juan Jose Lovato, filed their petition in the district court, alleging that the pueblo was the owner of a certain tract of land and possessed of the same situated in the county of Valencia, and known as the lands upon which

the pueblo is built; that the same was granted to them by the king of Spain or his viceroy; that the titles thereto were made out in due form and deposited with the archives at Santa Fe; that, by some means unknown to the petitioners, said titles had come to the hands and possession of one Vicente Ariluead, Victor de la O, and Ramon Sanchez; that neither had any right to detain or withhold them from the possession of the pueblo; that said persons were made defendants, and were of the county of Socorro; that they fraudulently refused to deliver up said titles to the pueblo unless they would pay the sum of six hundred dollars; that without the possession and without access to said titles the pueblo could not defend their rights to their lands in controversy with the pueblo of Laguna, and that defendants threatened to put the titles beyond the reach of the pueblo unless they would shortly pay the said sum of six hundred dollars. The pueblo prayed immediate relief and a final decree of the titles to them.

The judge at chambers enjoined the defendants from destroying or in any wise disposing of the documents to the prejudice of the pueblo. At the November term, 1854, the defendants filed their separate answers, and after some intermediate steps having been taken, and some points which were made having been decided by the court, the cause, by the agreement of the parties, was set down for hearing on the bill, answers, and exhibits. Upon the hearing the court dismissed the bill as to Ariluead and Sanchez, and as to De la O, decreed that the documents be surrendered to the pueblo of Acoma, their authorities or agents, and that a copy of the same be spread upon the records of the court, and that it also be recorded in the county of Valencia, where the lands of Acoma are situated. From this decree, which taxed the cost against De la O, he appealed to this court. In his answer he admitted that he had possession of the documents, and made exhibits of the same.

Its antiquity, and its connection with the history of the pueblo and their rights to their lands, will justify a more particular reference to its contents. It is entitled, "Privi-

lege of the pueblo of Acoma and of Guadalupe of the Paso del Norte, on the twenty-eighth day of September, one thousand six hundred and sixty-nine." It then proceeded to narrate, that the governor and captain-general, D Domingo Jerouse Petrez de Conzate said, that, "whereas by the victory obtained in New Mexico, Quentonese nations and apostates of that kingdom, and over the Lagunas, and all the other pueblos in which I directed that with much particularity they should make known the boundaries which the Indians of the pueblo of Acoma were subject, which at the time of this rebellion they showed and made known, with all the pueblos of that kingdom, and in the first place with the pueblo of Tia, and that of Moqui, and with the pueblo of Zuni, and these are of the Queres nations, and are at war with all the other pueblos, which was all placed in my knowledge concerning this pueblo of Acoma of the province of New Mexico:" The document then states that an Indian of Acoma, and whose name was Bartoleme de Ojedas, was wounded with a ball and arrow; was intelligent and could read and write; that he understood the Castilian language; that he was one of the most distinguished in the war, and had great influence among all the Indians, and particularly among the apostates, and was obeyed by all the pueblos, though only about twenty-two years of age; that being wounded and disabled, he surrendered, and was then put under oath by order of the captain-general, and disclosed the situation of Acoma, and the boundaries, their wars with the Lagunas, their moving to the Penol Rock, where they now are, and other parts of interest to their history. The captain-general then, in comformity with the authority in him vested, granted to Acoma the boundaries which Ojedas had described. The document was then signed by the governor and captain-general, by the Indian and by the civil and military secretary, as affirming and making the grant perfect. Its importance to Acoma is apparent.

Having embodied so much of the nature of the subject-matter claimed by the pueblo, it becomes necessary to turn our examination to De la O's answer, to enlighten ourselves as to the equity, justice, and legality of the decree below.

Many things are contained in this answer, which, though curious in themselves, when regarded as true, yet can not weigh with great force in favor of the respondent, when taken in connection with the entire response.   We will examine the most important averment.   De la O. claims not only the right to detain said original papers from said pueblo, but also to refuse them a copy of the same, by virtue of a contract made with said pueblo of Acoma, under and by virtue of which contract, the said pueblo promised and agreed to pay the sum of six hundred dollars in money, or property at prices then agreed upon between the said pueblo and this defendant, and which said contract was made in 1850.   He declares as his opinion that a copy of the document was given to the pueblo when the grant was made, and then, with much complacency, asserts, that if they, by negligence and want of care, have lost the copy, it now affords to the pueblo no valid right to take from him, without compensation, the original document, which by the care and diligence of himself and ancestors has been preserved from loss and destruction until one hundred and sixty-six years after its execution.

This was placed in the answer with a view to suggest, doubtless, or show some consideration upon which to justify the claim of six hundred dollars from the Indians, for putting into their hands that which was their own property and of right had been theirs for over a century and a half of time, let the possession have been where it may.   He evidently intended to inform the chancellor that through a long series of years his ancestors had done highly meritorious deeds in favor of the pueblo in relation to the document; that a debt had ensued in their favor against the pueblo, and that by some peculiar process the legal and equitable claims of this long line of ancestry against Acoma had concentrated in his person, as their only living representative, and that he had become the self-appointed executor to collect their interest and wind up their estate so far as the Acoma Indians were concerned.

It has been a graphic and expressive figure, not infrequently used to denote chancery powers, that the "arm of

the chancellor is long." The expression is imposingly true in its meaning, if his arm can stretch itself through the long line of ancestral ranks of this defendant, and. lay his hand upon the tomb of him who somewhere in the close of the seventeenth century, became the custodian of this document, and founded by his care and diligence, a pecuniary debt against Acoma, and handed the debt, the document and its custody, down from sire to son; the claim increasing from new services rendered by each succeeding generation, until at last this defendant becomes the lucky recipient of so many ancient merits. As the chancellor's arm rolls the various and steady accumulations of so many years, amounting to six hundred dollars, from the property of the Indians of the Penol or Rock of Acoma, into the hands of Victor de la O, impressed with the consciousness that seriousness adds dignity to judicial deliberations, we will follow the defendant in his relation of the circumstances under which he became the possessor and keeper of the document.

According to the account rendered by himself, and this with the view of weighing the merit of the consideration set up for the promise of the six hundred dollars, he calls his narrative "shedding further light upon this ancient document." He states his age to be fifty-four years, birthplace Chihuahua, and that he is the only child of his father, Gregorio de la O, who died in the year 1810, near Corralitos, in said state, at the age of sixty-four years; that his father was lieutenant of the dragoons of Spain; that he was a man of education and reading, and at his death had many papers and books; that defendant, by reason of his inability to read or write, did not know the value or nature of the books and papers, so he sold and squandered the most of them; that in 1833 he left Chihuahua and came to New Mexico, and in 1836 his wife also came hither, and that then the document and other papers were brought here by her, and that they have since then been here and in his possession; that the papers and documents were in his father's possession at the time of his death, but at what time or under what circumstances they came to his possession

is wholly unknown to respondent, but he presumes his father came honestly by them as "waifs floating upon the boisterous ocean of some of the revolutions of his day."

Such is the light defendant throws upon the ancient document. When we consider the rank of the defendant's father as a military officer under the Spanish monarchy, the son appears to have been the victim of misfortune. The father not only had rank, and it is to be presumed was one of the hidalgos of his time, but he had that which was still more meritorious, he was a man of education and reading, and had many papers and books. All this indicates a cultivated man, and one whose mind and moral senses were not only awakened, but likewise tutored and enlightened. We can not refrain from doing him the justice to presume that his only child, Victor, deeply interested and moved his heart and hopes. Especially must this have been so, as Victor makes no disclosures as to his mother in relation to this highly important portion of his biography. It seems unaccountable, therefore, why so literary and improved a Spanish officer should so cruelly have neglected the education of his only son, "sole heir of his house and heart." The child soon to be left an orphan was not by this literary father even taught to read and write. This was only a portion of his ill fortune. His father died, leaving the son when he was about ten years of age. It is saddening when we infer, as surely we must, that when so noted a personage left no one that would look after the interests of the estate, the large amount of papers and books fell into the hands of the boy, Victor, to sell and squander. It is a relief to the mind to believe that it rarely occurred in those days that such an estate and such an orphan could find no one to look after them. An administrator would have examined the papers and books, made an inventory, and brought to the attention of the probate the unclaimed waifs. The magistrate would have known quickly where those titled and public documents belonged, and taken steps for their restoration. The son, not taught to read by the literary father, was left in the midst of waifs and papers, documents and books, and in his childishness and utter ignorance of

their value, was permitted to sell and squander them at his will and fancy. At what time he learned that he had the title to the pueblo of Acoma defendant has not given exact information. In one instance he seems not to have been so blighted by his evil luck as at these points of his life which we have reviewed. In 1836, his wife brought to New Mexico the documents and papers which had been omitted by him. These have remained in his possession ever since. This statement in the answer seems carefully worded, and shows with a great degree of pointedness, certainly, that he had all the papers and documents at the time of making his answer, including the one in question, that were brought to him when his wife came.

We pause here to inquire from what source he obtained the title to the pueblo of Laguna, and which he swears he sold to General Armigo for the sum of two hundred dollars, and Armigo sold to Savacerio, and the latter to Laguna? From whence was this waif picked up and thrown into the market when the titles to both Laguna and Acoma became of great moment and value from the controversies that existed between them as to those respective boundaries? From De la O's own showing it was not found by his father as one of the floating unreclaimed waifs in his day. He came in 1833, ignorant of their contents. Three years afterwards his wife followed and brought them, as he says, and they were in his possession at the very moment of making his answer. Not a paper or document had departed from him. His answer authorizes this position. Yet he was in the trade of pueblo titles, and made his appearance, with documents in hand, when the wants of the Indians were rendering them liable to fall victims to extortions, and when their property could be wrung from them upon grounds wholly indefensible upon any principles of common honesty and equity.

We notice that part of De la O's answer relating to his and his ancestors' care and diligence in preserving the document from destruction and loss until the end of one hundred and sixty-six years after its execution, and that portion professing to "throw further light" upon it. In the latter he goes no further than one ancestor, and that

was his father, and then swears that at what time or under what circumstances it came to his possession is wholly unknown to defendant.  From whom did he learn that his father ever had it?  His father did not tell him, for he asserts ignorance of its existence among the papers the father left.  He did not learn it himself, for he could neither read nor write.  He shadows forth no knowledge of it until after the arrival of his wife in 1836.  How did he then gain the knowledge of his father's possession, twenty-six years previous, when he died?  Were the links of facts supplied by the wife following the chain up to the aged lieutenant's possession?  The possession of the Laguna document and its disposition will present itself, with all the force of the attending circumstances, full upon the mind, whilst examining this answer and weighing its credibility in the midst of its inconsistencies and extravagances. We can not avoid reflecting, too, that De la O admits substantially that he did speculate in pueblo Indian documents.

This court adheres, as it must, to the rule, that when a cause is set down for hearing upon bill, answer, and exhibits, the answer is to be taken as true.  It must, however, as to its statements, submit to a dissection by the court to ascertain what it admits or proves.  As it stands, no further testimony can be introduced by the plaintiff to attack, nor by the defendant to sustain it.  Both bill and answer are before the court, and legal principles aid the chancellor as he dissects them, both to see what is proven and established.  The complainants allege that the titles in question were made out in due form and deposited with the archives in Santa Fe.  The defendant's answer to this portion of the bill is worthy of notice.  He does not admit that they were so deposited, but avers his disbelief, and offers a short argument to the court to sustain his position.  His argument is "that they were never deposited there, or their existence would have been known to some one, and the manner in which they were taken away or lost out of said archives, would be accounted for."

It is but fair to apply such force as there is in this reasoning to one of the grounds stated in the answer, and insisted upon by a positive averment. "That defendant had a right to withhold and detain said papers from the pueblo and from the secretary's office of this territory, because said paper, upon its face, purporting to have been executed at El Paso, a place now and always heretofore without the limits of the United States, and the jurisdiction of this court, would properly belong to the archives of that city, and not to the archives of the secretary's office of this territory, at Santa Fe; and that by the Spanish law, the originals of all public documents and papers remained in the archives of the place of their execution." Now defendant has sufficiently committed his conscience, that the document was deposited with the archives at El Paso. How does he account for the manner it was taken away or lost from among those archives? How did it escape from there and become a waif unclaimed? How and when did it desert its secure abode among the archives of El Paso, and, separating itself from its companions upon the shelf, wander like a bird from the ark of her safety, to be found lost and floating upon the revolutionary ocean which the imagination of defendant has pictured in his answer? His mind moved boldly around to imagine how the document as a waif, floating unclaimed, was found, snatched from destruction, and preserved; but his spirit tired and drooped from the effort in its flight, his fancy retained no power to disclose how the document left the custody of its custodian on shore, to venture out at sea to endure so many perils, to be picked up by the literary lieutenant, and finally rescued by his illiterate son, as a profitable article of traffic in his trade in pueblo documents in New Mexico.

De la O avers that he had a right to withhold and detain the document in question, upon the ground that it belonged to the archives of El Paso. This averment deserves attention, with the view of seeing with what degree of cleanness he shows his hands to the chancellor, after admitting that he had the document and that it pertained to the rights of Acoma. If upon such ground he had the right to withhold

it from its owners, it was because it was a public document, belonging to a public office, to be kept by a public officer for public ends, and that being found in his hands, it was under legal protection even against its owners. For what purpose, then, was he protected in guarding the title? We answer, evidently it was that he might discharge the duty which he plainly manifests himself as having felt himself to have been under; that duty was without delay to have done all in his power to have restored the document to the public custodian. How, then, did he venture to make it a matter of traffic? How did he have the boldness to propose to sell the possession of a public document to the pueblo of Acoma, when it belonged to the custodian of the archives at El Paso? How does he assume the effrontery to come before the chancellor and defend his action in detaining the document from the Indians, because a public duty is in effect upon him, which the pueblo can not compel him to violate, while in the same breath he prays the court to compel the Indians to pay him six hundred dollars, while he violates it on his part? In what posture does he conceive himself to stand before the court while he asks it to sanction what he avers to be a contract with the pueblo, while in the same connection, in his answer he swears in substance that he had no right or power to make such contracts?

In view of all this, as if to make a parody of the recklessness of his conduct, he openly avers, when, too, the avowal was in no wise required from anything appearing in the cause, that he had had the title to the pueblo of Laguna; that he had sold the same, not, however, to Laguna, to whom it rightfully belonged, but to one unconnected with the pueblo, for the sum of two hundred dollars, in direct contradiction to the position he assumed for himself. He saw nothing wrong in turning a document of a public archive into the field of trade and profit for himself. It will not be said that the title to Laguna belonged any less to the public archives than did that of Acoma. Let the defendant have regarded his duty as he may have done, he certainly never made any efforts to lodge back into the

hands of the public custodian the Acoma title. And yet
he declares it has been so long a time in his possession.
We do not deem it irrelevant to remark, that the abstraction
from the archives of this territory of pueblo titles at a pe-
riod not very remote has become a matter of general notori-
ety from their nature and importance, and from their diffusion
throughout the territory, and the frequent attempts at ex-
torting money from the pueblos by means of these docu-
ments. We feel authorized to allude to the fact as one that
has assumed the dignity of an historical event. Perhaps
personal acts at a period when the political power of Mex-
ico passed to the United States, in this country, and before
the archives were possessed by the new power, could fully
explain how the pueblo titles became floating upon the revo-
lution of that day. Enough has been said to indicate our
opinion as to the contracts De la O has attempted to set up.

Upon a dissection of the whole answer, we can not per-
ceive that it establishes even a conscientious and equitable
ground upon which to base a consideration for the promise
to pay the six hundred dollars. Upon giving to the
defendant the fullest benefit of his answer as to his personal
case, and his preservation of the document, the time was
not very long during which he had the slightest knowledge
that he had the title in keeping. The guardianship was
wholly without cost, and he was not conscious of any trouble.
Had he done equitably, he would have immediately
imparted the fact to its owners that he had the title,
or restored it to the public custodian. We can not
admit that whoever comes into the possession of a public
document, paper, or record, by finding or otherwise, thereby
gains such a property in the same as to authorize him to
estimate the value the record or other writing may be to
him to whom it may belong, or who may have an interest
therein, and to withhold the same from the rightful owner,
or lawful custodian, until the sum estimated or demanded
for the picking up and keeping shall be paid. The wrongs
that might be perpetrated where such a doctrine should be
recognized and enforced can neither be counted nor meas-
ured. Every man's titles and all documents would become

the prey to insecurity. The fraudulent man would riot in this species of plunder, and the extortionist revel in his iniquity.

We can not regard the means used to obtain the promise of six hundred dollars other than as an unconscionable attempt at extortion from the Indians. We look upon the promise made without any just or equitable consideration, although the defendant swears that the pueblo is legally, equitably, and honorably bound to pay the six hundred dollars. Upon his own showing, the contract insisted upon was opposed to sound public policy. He avers the title in question to belong to the custody of the public officer, but we are satisfied that it is the property of the pueblo, and that De la O has no right to withhold from them the possession; that he has no lien upon the thing in controversy; that, from the light thrown upon this case by the answer, he has been amply paid with the eight dollars he received for any meritorious services rendered by him towards the pueblo, in relation to this title. His answer, when passed under dissection of scrutiny, is found worthy to be only slightly valued. It plainly manifests that his hands, in times passed, were stained in doing wrong to Indian pueblos, relative to their titles; and by his defense he but deepens their discoloration to a repulsive blackness.

Having closed our review of the merits of this case, we may be indulged in reflecting, that of the highly interesting causes we have had to consider and determine during the present session, this is the second in which this pueblo has been the party complainant. The first keenly touched the religious affections of these children of the Rock of Acoma. They had been deprived by a neighboring pueblo of the ancient likeness in full painting of their patron or guardian saint, San Jose. However much the philosopher or more enlightened Christian may smile at the simple faith of this people in their supposed immediate and entire guardian of the pueblo, to them it was a pillar of fire by night and a pillar of cloud by day, the withdrawal of whose light and shade crushed the hopes of these sons of Montezuma, and left them victims to doubt, to gloom, and

to fear.  The cherished object of the veneration of their long line of ancestry, this court permanently restores, and by its decree confirms to them, and throws around them the shield of the law's protection in their enjoyment of their religious love, piety, and confidence.   In this case, the title that Spain had given this people, confirming to them the possession and ownership of their lands, and the rock upon which they have so long lived, was found in the hands of one professing to be of a better-instructed and more civilized race, and turned by him into the means of extortion and money-gathering from the unoffending inhabitants.

It is gratifying to us to be the judicial agents through which an object of their faith and devotion, as well as the ancient manuscripts, that is the written evidence that established their ancient rights in their soil and their rock, are more safely restored and confirmed to their possession and keeping.

The decree of the district court is affirmed, with costs.