STATE OF NORTH CAROLINA v. B. C. WEST, JR.

No. 761SC288

(Filed 17 November 1976)

1. **State § 2.1— bills of indictment — statutory requirement of permanent retention**

In an action by the State to be declared owner and to regain possession of two bills of indictment issued in 1767 and 1768 and held by defendant, the State met its burden of proving that the indictments were required by law to be permanently retained by virtue of the requirement in G.S. 14-76.

2. **State § 2.1— title to government property — passage according to statute only**

It is a well settled principle of law that title to government property may pass only in the manner prescribed by the duly constituted legislative body and that title to any such property may not be forfeited through the oversight, carelessness, negligence or even intentional conduct of any of the agents of the government.

3. **Clerks of Court § 10— duty to maintain court records — indictments in hands of private individual — presumption that clerk performed duty overcome**

In an action by the State to be declared owner and to regain possession of two bills of indictment issued in 1767 and 1768 and held by defendant, the State's evidence that the clerks of court were required by law to maintain records of the court and that statutory provisions were made for the transfer of records from one court to another as various court reforms were made through the years was sufficient to overcome the presumption that public officers had properly performed their duty, since the documents were in defendant's hands.

4. **Clerks of Court § 10— indictments in court records — clerk charged with safe keeping — sufficiency of proof of improper removal**

In an action by the State to be declared the owner and to regain possession of two bills of indictment issued in 1767 and 1768 and held by defendant, the State's evidence tending to show that the indictments were at one time in the records of the Salisbury Court of Jus-

tice and that the clerk of that court was charged with the responsibility of safe keeping the court records pursuant to Chapter I of the 1766 Laws of N. C. was sufficient to prove that the indictments were in a public archive and were stolen or otherwise improperly removed.

5. **State § 2.1— public records — property of State — no title in individual**

Public records and documents are the property of the State and not of an individual who happens to have them in his possession; when such records are deposited in the place designated for them by law they can be removed only pursuant to an act of the legislature and in the manner and for the purpose designated by law.

6. **State § 1— defeat of Britain by 13 colonies — incidents of sovereignty devolved upon State — public records owned by State**

Pursuant to the well established rule of international law that sovereignty is never held in suspense but survives changes in government and forms of government, all the property, rights and other incidents of sovereignty held by the British Crown immediately devolved to the thirteen colonies or states upon the defeat of Great Britain by the colonies in the Revolutionary War; therefore, the State of N. C. succeeded to the public records of N. C. previously owned by the Crown and could properly claim ownership of two indictments which originated as records of a British colony.

7. **State § 1— defeat of Britain by 13 colonies — government property held by Britain devolved to States**

Since the Articles of Confederation adopted in 1781 provided for 13 sovereign states, each almost completely autonomous within its territorial boundaries, any property of government held or owned by Great Britain prior to the Revolutionary War immediately upon Great Britain's defeat devolved to the individual states rather than to the central government of the thirteen states.

8. **State § 2.1— public records — disposition not provided for by legislature**

The General Assembly has not authorized the sale, disposition or forfeiture of public documents or court records but has authorized a manner in which such documents are to be maintained; moreover, the General Assembly has not prescribed a statutory period within which the State must recover its lost or stolen public records, and in addition, there has never been a legally authorized means of selling, forfeiting or abandoning public documents of the State of N. C.

9. **State § 2.1— public document — bona fide purchaser only after legal disposition by public authority**

There can be no bona fide purchaser of a public document absent a showing that the duly authorized public authority has legally disposed of that document.

10. **State § 2.1— bills of indictment — title in State — no title in private individual in possession of indictments**

Ownership of bills of indictment issued in 1767 and 1768 rested in the State and could not be forfeited through the oversight, carelessness or even intentional conduct of any of the agents of the

State; thus, legal title to the documents could not pass to a private individual who happened, 200 years later, to have them in his possession.

**11. State § 2.1— public court records — purchase by citizen in good faith — no title in citizen**

The public is not to lose its rights to public court records through loss, theft or the unexplained removal of the records from the court, nor because one of its citizens purchased the documents in good faith, since it was his duty, as much as that of every other citizen, to protect the State in its rights.

Judge BRITT dissenting.

APPEAL by the State from *Webb, Judge*. Judgment entered 6 November 1975 in PASQUOTANK Superior Court. Heard in the Court of Appeals 24 August 1976.

The State filed complaint seeking to be declared owner and to regain possession of two bills of indictment held by defendant. The indictments were issued in 1767 and 1768 and were signed by William Hooper (who later signed the Declaration of Independence) as attorney for the King. Defendant answered and asserted that the documents were his property since he had purchased them for value and in good faith on the open market. Defendant addressed certain interrogatories to the State and the State responded through Dr. Thornton Mitchell, Chief of the Archives and Record Section of the Division of Archives and History, Department of Cultural Resources. These interrogatories reveal that the indictments were issued by the Salisbury District Superior Court; that a 1766 act of the Colonial Assembly provided for the appointment of a clerk who was to give bond "for the safekeeping of the records"; that the colonial District Superior Courts closed in 1773; that such courts were re-opened in 1778 as State District Superior Courts; that these District Superior Courts were succeeded by County Superior Courts in 1806; that the legislature made certain provisions for the transfer of old court records and that it is assumed that records from the colonial District Superior Courts were to be turned over to the new clerk; that certain further provisions were made in 1868 for the transfer of old court records, but that these latter provisions did not refer to the colonial District Superior Courts. State's answers to the interrogatories further reveal that the State possessed certain bills of indictment from the Salisbury District Superior Court of 1767-1770; that other indictments from this period

were missing; that the State did not know who or when the indictments held by defendant had been removed from the clerk's office; and that the State learned of these indictments when defendant offered to sell them in late 1974 or early 1975. It was stipulated between the parties that William Hooper's signatures on the indictments were genuine and authentic. State moved for summary judgment. A hearing was held which the State presented the two indictments as exhibits and also presented certified copies of pages from the Salisbury Crown Docket of 1767-1768. Certain docket entries referred to the defendant and charges contained in the indictments, and thus tended to authenticate them.

Evidence for defendant tended to show that State demanded possession of the indictments pursuant to G.S. 132; that it was not known whether the State had possession of the indictments when G.S. 132 became effective in 1935; that the State first undertook control over public records by legislation of 1903; that since 1903 some public records have been authorized destroyed; and that it is not known whether there were any guidelines for destroying public documents prior to 1903. Defendant identified and introduced as exhibits certain pages from "The Historical Records of North Carolina." These books, prepared in the 1930's, surveyed the public records of Rowan County and tended to show that these indictments were not accounted for at that time. Defendant testified that he purchased the indictments at 1974 auctions in New York. It was stipulated that the New York auction house had obtained the indictments from a resident of East Bend, North Carolina, and that he had in turn obtained one of the indictments from a Winston-Salem resident and the other indictment from the Greensboro Historical Museum. Defendant presented four witnesses who either sold or collected historical manuscripts and autographs. These witnesses' testimony tended to show that public records have gotten into private hands by various means, that private collectors are important in the preservation of historical manuscripts, and that public records are often traded in the manuscript market. The clerk of superior court of Pasquotank County testified that she had possession of no court records from prior to 1925, that certain records had been stored in the bell tower of the courthouse, but that these records were "taken away." In rebuttal, State called Mitchell back to the stand and had him testify that in 1961 the State had authorized Pasquotank County to transfer certain old court records to a

local historical society for safe keeping with legal custody remaining in the county.

The plaintiff moved for summary judgment on the ground that there was no genuine issue as to any material fact and in the alternative to determine the facts controverted and make an order specifying the facts that appear without substantial controversy.

Judgment was entered finding that there was no evidence as to how long the indictments had stayed on file with the Salisbury District Superior Court or any successor court or as to how the indictments had been removed from the courts and that the judge "cannot hold as to what the officially sanctioned practices of the various clerks and other custodians of court records have been in regard to the disposition of bills of indictment in the more than 200 years in which these documents have been in existence." The judge therefore concluded that he could not determine that the indictments had been taken from the courts "in any irregular manner." He concluded that defendant was entitled to possession of the documents, that plaintiff's motion for summary judgment should be denied, and that plaintiff's action should be "dismissed with prejudice." Plaintiff appealed.

*Attorney General Edmisten, by Special Deputy Attorney General T. Buie Costen, and Assistant Attorney General Thomas M. Ringer, Jr., for the State.*

*Leroy, Wells, Shaw, Hornthal, Riley & Shearin, by Dewey W. Wells, for the defendant.*

MARTIN, Judge.

It appears that plaintiff complied with G.S. 1A-1, Rule 7(b)(1), requiring that motions made prior to a hearing or trial be in writing, and G.S. 1A-1, Rule 56(c) relating to service of motions for summary judgment. The record does not reveal that defendant filed affidavits in opposition to plaintiff's motion.

Under Rule 56(e)

"[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his plead-

ing, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

In this proceeding Mr. West was the "adverse party." However, the parties stipulated that ". . . upon the hearing of plaintiff's Motion for summary judgment the defendant may present oral testimony of witnesses, and such testimony may be considered by the Court both for the purposes of ruling on the Motion for summary judgment, and for determination of the case on its merits."

In 6 Moore, Federal Practice § 56.11[8] at 56-295, (2d ed. 1976), it is said:

"Of course, if all the parties desire to and do turn the summary judgment into a court trial they cannot be heard to object. In that event the court should make findings of fact and conclusions of law in accordance with Rule 52."

In view of the condition of the record and the stipulations of the parties, we will proceed to consider the appeal on its merits.

The authenticity of the indictments and their presence in public custody were established by the pleadings, answers to interrogatories and stipulations and also found as a fact by the court in its findings that "two bills of indictment were docketed in the Salisbury District Superior Court shortly after they were drawn in 1767 and 1768 respectively." The character of the indictments as court records having been established, the legal question of ownership remained for decision in the trial court.

The defendant's claim of ownership set forth in his pleadings is as follows:

"The documents referred to in the Complaint are privately owned papers which, along with many others of like nature, constitute the subject matter of international trade whereby they are bought, sold and exchanged by amateur and commercial collectors, privately and through established trading facilities. The documents described in the Complaint were acquired in good faith by the defendant by purchase for value on the open market from an established auction

State v. West

facility and in defendant's hands said documents retained their character as private property. Notwithstanding the public office then held by the signer of the specific documents referred to in the Complaint, the plaintiff has no present interest therein nor does plaintiff have an interest in similar publicly traded documents held by bonafide collectors."

By its sixth assignment of error plaintiff contends the court erred in its conclusions of law contained in the judgment. We agree.

The conclusions of law upon which the judgment is based are numbered 1 and 2. Conclusion 3 and 4 merely follow. Conclusions 1 and 2 read as follows:

"1. This Court cannot hold that in the more than two hundred years existence of each of these Bills of Indictment that either of them left the possession of the Salisbury District Superior Court or any of its successors in any irregular manner.

"2. The defendant has possession of the documents which he obtained in good faith. The State of North Carolina has not overcome the presumption of title which arises in the defendant's favor through his possession of the documents."

Defendant contends that in order to bear its burden of persuasion, the State must (a) prove the indicments were required by law to be permanently retained; (b) overcome the presumption that public officials have properly performed their duty; and (c) prove that the indictments were in a public archive and were stolen or otherwise improperly removed.

[1] First, has the State proved that the indictments were required by law to be permanently retained? The answer is yes.

This obviously is a question of law rather than one of fact. G.S. 14-76 would appear to lay this question to rest. See also *State v. Bellar*, 16 N.C. App. 339, 192 S.E. 2d 86 (1972), concerning a modern court file which for its holding cites Am. Jur. as follows:

" 'The custodian of a public record cannot destroy it, deface it, or give it up without authority from the same source which required it to be made. Thus, an indictment

duly filed cannot be removed legitimately by anyone, including the district attorney, except for purposes of the trial thereon, or for purposes of evidence under a subpoena duces tecum or an order of court. 45 Am. Jur., *supra* Sec 12, p 425.' " *State v. Bellar, supra* at 343, 192 S.E. 2d at 89.

G.S. 14-76 may be traced back to 8 Henry VI, Chapter 12, Section 3 wherein the prohibition appears as follows:

"III. And moreover it is ordained, That if any record, or parcel of the same writ, return, panel, process, or warrant of attorney in the King's courts of chancery, exchequer, the one bench or the other, or in his treasury, be willingly stolen, taken away, withdrawn, or avoided by any clerk, or by other person, because whereof any judgment shall be reversed; that such stealer, taker away, withdrawer, or avoider, their procurators, counsellors, and abettors, thereof indicted, and by process, thereupon made thereof duly convict by their own confession, or by inquest to be taken of lawful men, whereof the one half shall be of the men of any court of the same courts, and the other half of other, shall be judged for felons, and shall incur the pain of felony. (2) And that the judges of the said courts of the one bench or of the other, have power to hear and determine such defaults before them, and thereof to make due punishment as afore is said."

The 1749 Laws of North Carolina, enacted in New Bern, specifically declared certain English statutes to be in

". . . as full Force, Power, and Virtue, as if the same had been specially Enacted and made for this Province, or as if the same had been made and Enacted therein, by any General Assembly thereof." Laws of North Carolina, 1749, c. 12 (Swan).

Among the statutes enumerated by this 1749 statute is 8 Henry VI, Chapter 12. Later, after the Declaration of Independence, the 1778 Laws of North Carolina, enacted at New Bern, declared to be in full force

". . . all such Statutes, and such Parts of the Common Law, as were heretofore in Force and Use within this Territory . . . as are not destructive of, repugnant to, or inconsistent with the Freedom and Independence of this State." Laws of North Carolina, 1778, c. 5.

In addition, Chapter 34, Sec. 33 of the North Carolina Revised Statutes of 1837 carried 8 Henry VI, Chapter 12 over into the statutes of the State in almost word for word form. It was likewise carried over in Chapter 34, Section 31 of the 1855 Revised Code and continues on our books to the present date. See G.S. 14-76.

Additionally, early commentaries on the common law support the position that court records were to be permanently retained. Sir Edward Coke, basing his holdings on Glanville, Bracton, and Britton, wrote that a record ". . . is a memorial or remembrance . . . of the proceedings and acts of a court of justice. . . ." 3 Coke, Institutes *322. In addition, Blackstone also wrote that all courts of record are the King's Courts and ". . . the acts and judicial proceedings [of such courts] are enrolled in parchment for a *perpetual* memorial and testimony." 3 Blackstone, Commentaries, *24 (emphasis added).

The laws of the colony and of Great Britain provided for the indictment of criminals. The bills of indictment were handwritten by a clerk, signed by the attorney for the King and maintained in the clerk's custody. The bills of indictment here in question were issued from the Salisbury District Superior Court of Justice.

The Salisbury Court had been established by the Colonial Assembly in 1766 by an act which also authorized the Chief Judge to appoint a clerk to keep the records. Section V of that act provided:

". . . that the Chief Justice is hereby impowered to appoint experienced and Discreet Clerks of the Superior Court; who shall each of them give Bond, with good and sufficient Security, to our Sovereign Lord the King, his Heirs and Successors, in the Penalty of Two Thousand Pounds, for the SAFE KEEPING OF THE RECORDS, AND FAITHFUL DISCHARGE OF HIS DUTY IN OFFICE." Laws of North Carolina 1766 (2nd. Session, 1767), c. 1, s. 5 (emphasis added).

In his answers to interrogatories propounded by the defendant, we quote from testimony of Dr. Thornton W. Mitchell, Chief of the Records Section of the Division of Archives and History as follows:

"We presume that the documents were in the custody of the respective clerks of court until their unauthorized removal.

To the best of our knowledge, John Frohock was the clerk of the Salisbury District Superior Court at the time that these indictments were made. The names of the succeeding clerks and custodians are not easily available, but the titles of the persons who were authorized to maintain custody of these documents are listed below:

1767-1773—Clerk of the Crown, Salisbury District Superior Court.

1773-1777—Clerk of the Oyer and Terminer, Salisbury District.

1777-1806—Clerk of Salisbury District Superior Court.

1806—Undetermined date—Clerk of Superior Court of Rowan County."

\*      \*      \*

"We are of the opinion that from at least the year 1760 until the twentieth century, clerks of court of record have been required to maintain in their custody bills of indictment and other court records. . . . This court was designated a court of record by a 1760 act of the Colonial Assembly and the records created by this court were open for inspection as public records (I 1760 NC Laws, pt II, C 1, S 4, 7, 38 passim). The court act of 1762, amended and continued in 1764, repeated the salient features of the superior court act of 1760 (1762 NC Laws, c 1, s 6, 9, 36, passim, and 1764 NC Laws, pt II, c 1).

"The court act of 1766 provided for the appointment of clerks of district superior courts (including the Salisbury District Superior Court) who were to give bond in the amount of Two Thousand Pounds 'for the Safe Keeping of the Records, and faithful discharge of [their] Duty in Office.' This act further provided that wills were to be kept 'in the Clerk's Office, amongst the Records of the respective Superior Courts . . . whereunto any Person may have recourse as to other Records, except for the Time the same shall or may be removed before any other Court, upon the Determination of any Controversy.' (1766 NC Laws, c 1, s 5, 18.) This act expired on March 6, 1773, whereupon the colonial District Superior Courts closed (1764 NC Laws, pt. II, c 1). When the courts were reopened in 1778 as State District Superior Courts, the court act of

1777, and subsequent years, provided for continuation of causes from the dockets prior to 1773 to dockets to commence in 1778. The continuation of cases from the dockets of 1772 to the dockets of 1778 presupposes the assumption that such dockets are a continuation of the same series of public records.

"When the District Superior Courts came to an end with the creation of County Superior Courts in 1806, specific provisions were made for the transfer and transition of records of the superseded courts (Potter, LAWS, c 694, s 10, 11). Clerks of the former District Superior Courts were 'constituted clerks of the superior courts to be holden in the several counties in which their respective offices are now situated. . . .'

"At the time of the court reforms of 1868, specific provisions were made for transfer and preservation of records of the abolished Court of Pleas and Quarter Sessions, the County Superior Courts of Law, and the County Courts of Equity . . . . [C]lerks of the new superior court were to receive 'all the records, books, papers, monies, and property' of those former courts."

Secondly, has the State overcome the presumption that public officials have properly performed their duty? The answer is yes.

[2, 3]   It is obvious from the foregoing discussion that some court official has not properly performed his statutory and common law duty with regard to the preservation of these indictments since they are now found in the hands of defendant. Such official, regardless of when the offense occurred, would have either been in violation of G.S. 14-76 or its various prior enactments or negligent in the performance of his duties. It is a well settled principle of law that title to government property may pass only in the manner prescribed by the duly constituted legislative body and that title to any such property may not be forfeited through the oversight, carelessness, negligence, or even intentional conduct of any of the agents of the government. See *U. S. v. Mallery*, 53 F. Supp. 564 (1944). This legal principle applies to government land, personal property or public records. The underlying rationale of this rule is that property owned by the government is held in trust for the people and that the intentional or negligent acts of the agents of the government should

not serve to deny the people of the benefits and enjoyment of "their" property. See *Bartholomew v. Staheli,* 86 Cal. App. 2d 844, 195 P. 2d 824 (1948).

**[4]** Thirdly, has the State proved that the indictments were in a public archive and were stolen or otherwise improperly removed? The answer is yes.

The State introduced the court docket entries pertaining to the subject indictments, the indictments themselves, and the testimony of Dr. Thornton Mitchell in establishing their presence at one time in the records of the Salisbury Court of Justice. In fact, the court found as a fact that the two bills of indictment were filed in the Salisbury District Superior Court.

There is no evidence of abandonment nor of any legal means to abandon indictments in the face of English and North Carolina law. Even if the indictments were mislaid or lost, the finder derives no title against the true owner. See 1 Am. Jur. 2d *Abandoned Property* § 19, § 23 (1962). Moreover, the owner may sue for its recovery. See 1 Am. Jur. 2d, *supra,* § 25, § 26.

Defendant cites the general rule from 29 Am. Jur. 2d Evidence § 235 (1967) as follows:

> "As a general rule, proof of the possession of personal property is prima facie evidence of title or is said to raise a presumption of ownership, which may be rebutted or overcome by evidence of ownership in another or by evidence of the circumstances surrounding the possession."

Defendant's own authority then goes on to refer to another section from American Jurisprudence which clarifies this point. That section states that:

> "Mere possession, however, unaccompanied by other circumstances giving it a specific character, is not such evidence of ownership as to prevail against the true owner except with reference to negotiable instruments and whatever comes under the general denomination of currency." 63 Am. Jur. 2d *Property* § 36 (1972).

**[5]** The above general rules govern most species of property. However, the rule respecting public records is as follows:

> "Public records and documents are the property of the State and not of the individual who happens, at the moment,

State v. West

to have them in his possession; and when they are deposited in the place designated for them by law, there they must remain, and can be removed only under authority of an act of the legislature and in the manner and for the purpose designated by law." 66 Am. Jur. 2d *Records and Recording Laws* § 10 (1973).

We take judicial notice of Chapter I of the 1766 Laws of North Carolina which dealt with six judicial districts, including the Salisbury District Superior Court of Justice in Salisbury, North Carolina. The act creating this court gave this court jurisdiction over both civil and criminal matters within the boundaries of that district. The act further provided for the appointment of a clerk who was to be bonded as security for " . . . the Safe Keeping of the Records, and Faithful Discharge of his Duty in Office." See Laws of North Carolina 1766, *supra*. Therefore, as a matter of law, the Clerk of the Salisbury District Superior Court was charged with the responsibility of "safe keeping" court records pursuant to the 1766 court act.

Bills of indictment were kept by the clerks during this period as a part of the court records. In its response to interrogatories, the plaintiff has listed eleven criminal case files which originated in the Salisbury District Court between 1767 and 1770 and which contains bills of indictment. Those court records are now permanently lodged in the State Archives. They are as follows:

KING v SAMUEL MOORE — March Term, 1767
KING v HUGH BERRY — September Term, 1767
KING v DOROTHY ERVIN — March Term, 1768
KING v JAMES MATHEWS — September Term, 1768
KING v EZEKIEL SMITH — September Term, 1768
KING v LEWIS LOWERY, ET AL — March Term, 1769
KING v JOHN RYALL — March Term, 1769
KING v HUGH FOSTER, ET AL — September Term, 1769
KING v JOHN FROHOCK — September Term, 1769
KING v HENRY SMITH — September Term, 1769
KING v WILLIAM HUDGEONS — September Term, 1770

Thus, we conclude that the State has proved (a) the indictments were required by law to be permanently retained, (b) overcome the presumption that public officials have properly performed their duty, and (c) proved that the indictments were

in a public archive and were stolen or otherwise improperly removed.

[6] Orginating as records of a British colony, the remaining crucial question is by what authority does the State of North Carolina now claim ownership of these documents?

The documents were court records originating out of the Salisbury District Superior Court of Justice shortly after it was formed in 1766. Although the clerk was designated as custodian of the records of this court, the records were the property of the Crown. In addition, the Court Act of 1766 provided for the appointment of a clerk in the Salisbury District Superior Court who was to give bond for the "Safe Keeping of the Records." After the defeat of Great Britain by the thirteen colonies, the Crown lost all rights which it previously held in the property of government, including public records, except as otherwise provided by treaty. However, there was no lapse in ownership after the British defeat since all the property, rights and other incidents of sovereignty immediately devolved to the new sovereign colonies, or states. It is a well established rule of international law that sovereignty is never held in suspense. Sovereignty survives changes in government and forms of government. See *U. S. v. Curtiss-Wright Export Corporation*, 299 U.S. 304, 81 L.Ed. 255, 57 S.Ct. 216 (1936). See also 45 Am. Jur. 2d. *International Law* § 40 (1969). The second edition of American Jurisprudence quotes from Wheaton on this same point:

> " 'As to public debts, *whether due to or from the State*, a mere change in the form of the government or in the person of the ruler does not affect their obligation. The essential power of the state, that which constitutes it an independent community, remains the same; its accidental form only is changed. The debts being contracted in the name of the state, by its authorized agents, for its public use, the nation continues liable for them, notwithstanding the change in its internal constitution. *The new government succeeds to the fiscal rights, and is bound to fulfil the fiscal obligations, of the former government.*' " 45 Am. Jur. 2d *International Law, supra* (emphasis added).

The property interest of the sovereign in a debt owed to the sovereign is analogous to the property interest of the sovereign in its public documents. For this reason, the State of

North Carolina succeeded to the public records of North Carolina previously owned by the Crown.

[7] The Revolutionary War officially ended upon the signing of the Treaty of Paris in 1783. At the time that this document was signed, the former colonies existed as states under the Articles of Confederation, which had been adopted in 1781. Under this system of confederation, each state retained a large measure of independence. There were thirteen sovereign states, each almost completely autonomous within its territorial boundaries. Thus, any property of government formerly owned or held by the Crown devolved, under the aforementioned theory, immediately to the individual states rather than to the central government of the thirteen states.

The "Treaty of Paris" specifically provided for the restoration of archival documents and public records to the states requiring Great Britain to:

" . . . also order and cause all Archives, Records, Deeds and Papers belonging to any of the said States, or their Citizens, which in the Course of the War may have fallen into the Hands of His [the Crown's] officers, to be forthwith restored and delivered to the proper States and Persons to whom they belong." Definitive Treaty of Peace, 1783, Article 7, 8 Stat. 83.

The effect of the above-cited provision was to extinguish all right or interest which the British Crown held in the "Archives, Records, Deeds and Papers" of the government of North Carolina. Moreover, as a matter of sovereignty law, all such archives, records and papers belonging to the Crown remained the property of the Crown until the State became the sovereign.

With respect to public records, the applicable law has been summarized as follows in the second edition of American Jurisprudence:

"Public records and documents are the property of the state and not of the individual who happens, at the moment, to have them in his possession; and when they are deposited in the place designated for them by law, there they must remain, and can be removed only under authority of an act of the legislature and in the manner and for the purpose designated by law. The custodian of a public record cannot destroy it, deface it, or give it up without authority

from the same source which required it to be made. *Thus, an indictment duly filed cannot be removed legitimately by anyone, including the district attorney,* except for purposes of trial thereon, or for purposes of evidence under a subpoena duces tecum or an order of court. Hence, where a district attorney for the purpose of trapping a criminal removes an indictment from the files, even though it is done with the knowledge and informal consent of a judge, the removal is improper and the indictment is not legitimately in his possession, but is to be considered as being the possession of the state; for neither the act of the district attorney nor the consent of the judge is binding on the state." 66 Am. Jur. 2d *Records and Recording Laws, supra,* (emphasis added).

More specifically, the Supreme Court of North Carolina ruled as early as 1873 that the possession and custody of court records are by statute " . . . vested in the clerk, AND THE PROPERTY IS IN THE STATE." *Commissioners v. Blackburn,* 68 N.C. 406, 410 (1873) (emphasis added).

In North Carolina, the General Assembly has acted in certain instances to prescribe the manner in which its property may be disposed. See G.S. 146, G.S. 1-35, G.S. 121-5, and G.S. 132-3.

**[8]**  An examination of the above statutory provisions indicates that the General Assembly has prescribed a method for the sale of surplus State land and personal property and that it has established a statute of limitations within which the State must evict would-be adverse claimants to State land. However, the General Assembly has not authorized the sale, disposition or forfeiture of public documents or court records. Rather, it has authorized a manner in which such documents are to be maintained. Moreover, the General Assembly has not prescribed a statutory period within which the State must recover its lost or stolen public records. In addition, there has never been a legally authorized means of selling, forfeiting or abandoning public documents of the State of North Carolina.

The case at bar is similar in many respects to a case ruled upon by the Supreme Court of New York in 1868 in *Mayor of the City of New York v. Lent,* 51 Barb. 19 (1868). That case involved a letter written in 1785 by George Washington and addressed to the mayor, recorder, and aldermen of the City of

New York. In 1863, a distinguished book collector, John Allan, died and in the next year his library was advertised for sale at auction. The Washington letter, which had been delivered to the mayor and aldermen in 1785, was among the papers found in the Allan library. It was sold to a Mr. DeWitt C. Lent.

A question was raised as to how that document left the archives of the City of New York. The City brought suit against Mr. Lent for the return of the document. The Supreme Court of New York delivered the following opinion:

> "In the present action the letter was a particular and peculiar species of property. Its style, address and responsive character to a legislative act, should of itself be regarded as having imparted notice to all, that from the moment of its reception and sending it became the property of the corporation to whom it was addressed.

> "Unlike other personal property, which ordinarily possesses but little, if any, distinctive mark which might place individuals upon inquiry, this letter, so written, in such terms, and so addressed, held Allan to constantly recurring notice of its ownership by the corporation.

> "His possession was wholly unexplained, and the jury have charitably found that he had become possessed of it, but without title by any alienation from the corporation who were originally and rightfully its possessors and owners.

> "No notice is shown to have been at any time given to the corporation of the possession by Allan. Had such notice been shown, the statute of limitations by appropriate lapse of time might have had application." *Mayor of the City of New York v. Lent, supra* at 27.

The form, substance, and nature of the indictments involved in the instant case imparted notice to the world that they were court records of North Carolina. As in the Washington letter case, the manner in which these indictments left the custody of the State is totally unexplained. Moreover, no notice was ever given to the State that the indictments were in the hands of private collectors until late 1974 or early 1975, when two State archivists discovered the proposed sale of these indictments in catalogues published by the defendant.

[9] The effect of the holding in the New York Washington letter case is that there can be no bona fide purchaser of a public

document absent a showing that the duly authorized public authority has legally disposed of that document.

The State's superior right in the documents here in question is further supported by an opinion of the New Mexico Supreme Court. In *De La O v. Acoma,* 1 N.M. 226, 236 (1857), the court held:

> "We can not admit that whoever comes into the possession of a public document, paper, or record, by finding or otherwise, thereby gains such a property in the same as to authorize him to estimate the value the record or other writing may be to him to whom it mav belong, or who may have an interest therein, and to withhold the same from the rightful owner, or lawful custodian, until the sum estimated or demanded for the picking up and keeping shall be paid. The wrongs that might be perpetrated where such a doctrine should be recognized and enforced can neither be counted nor measured. Every man's title and all documents would become the prey to insecurity. The fraudulent man would riot in this species of plunder, and the extortionist revel in this iniquity."

We have carefully examined the cases cited by defendant as supportive of his claim of ownership of the indictments and found them inapplicable to the facts of this case.

The Court found that the indictments were filed in the Salisbury District Superior Court and dated March 23, 1767, and September 5, 1768, and signed by William Hooper as attorney for the King. All the evidence supports these findings.

The trial court having found that the bills of indictment were docketed in the Salisbury District Superior Court, it follows without question that they became public records and therefore property of the State. As court records, it follows as a matter of law that they are required to be permanently retained in the custody of the court and can be removed only by authority of an act of the legislature and in the manner and for the purpose designated by law.

[10] Since ownership to the bills of indictment is in the State, it cannot be disposed of except as provided by law. It cannot be forfeited through the oversight, carelessness or even intentional conduct of any of the agents of the State. Thus, the documents in question left the custody of the court in an unlawful manner

and legal title thereto cannot pass to the individual who happens, at the moment, to have them in his possession.

[11]    The public is not to lose its rights through loss, theft or the unexplained removal of the public records from the custody of the court, nor because one of its citizens purchased the documents in good faith, because it was his duty, as much as that of every other citizen, to protect the State in its rights.

For the reasons stated, we hold that the two bills of indictment are property of the State of North Carolina and it is entitled to the possession thereof to be held in trust for the public.

Reverse.

Judge HEDRICK concurs.

Judge BRITT dissenting.

While I commend the efforts of our division of Archives and History to diligently preserve documents and artifacts relating to the history of our great State, I do not feel that plaintiff has established title to the documents in question, namely, two bills of indictment signed by William Hooper, one of the persons who, in 1776, signed the Declaration of Independence on behalf of North Carolina.

The two indictments purportedly were signed by Hooper in 1767 and 1768 when he was serving the Salisbury District Superior Court as attorney for King George the Third. The most that plaintiff showed in attempting to establish title to the documents was (1) that they were signed by an official of the Crown in 1767 and 1768, and (2) that they were found in the possession of private citizens more than 200 years later. There was no showing that either document has been in the possession of any government official since 1768.

I suggest only a few questions that plaintiff failed to answer. Were court officials in colonial North Carolina required to preserve bills of indictment after they had served their purpose? During the turbulent 1770's were court papers deliberately discarded? Were colonial court papers included in the "property" that the new State wrested from Great Britain? If so,

have the laws of our State since 1776 continuously forbidden the discarding of all court papers?

The burden was on plaintiff to establish title to the documents. Since the foregoing and other questions have not been answered to my satisfaction, I respectfully dissent to the majority opinion.