STATE OF NORTH CAROLINA v. B. C. WEST, JR.

No. 38

(Filed 13 June 1977)

1. State § 11— action by State—statute of limitations

The three year statute of limitations did not bar the right of the State to recover two bills of indictment issued in 1767 and 1768 because (1) nothing in the record indicates when the documents were taken from the possession of the State and so the record does not show when the State's cause of action for their recovery arose, and (2) no statute of limitations runs against the State

State v. West

unless it is expressly named therein, and the statute pleaded by defendant has not been expressly made applicable to the State.

**2. State § 1— change of sovereignty—official property**

A change of sovereignty transfers but does not alter the right of the former sovereign to his official, as distinguished from his personal, property.

**3. State § 1— transfer of sovereignty from the King to the State**

While the Treaty of Paris recognized the established fact of history that North Carolina was, by reason of a successful revolution, a free and independent state, and no longer a British colony, this accomplished fact, not the formal recognition of it, transferred the sovereignty in North Carolina from the King to the State.

**4. State § 2.1— indictments signed by King's Attorney—right to possession—transfer of sovereignty**

The turmoil and confusion incident to the War of the Revolution did not terminate the title of the sovereign to bills of indictment signed by the Attorney for the King in 1767 and 1768 or defeat the King's right to the possession thereof, and succession of the new sovereignty to the properties of the old sovereign was instantaneous, for there is no gap in sovereignty.

**5. State § 2.1— indictments filed in King's court—rights of the State**

At some time between the creation of the right of King George III in and to indictments filed in the King's court for the District of Salisbury in 1767 and 1768 and the signing of the Treaty of Paris, the State of North Carolina succeeded to the sovereign rights and properties of the King, including the indictments, whether then in or out of the possession of the King's custodian.

**6. Abandonment of Property § 1— passage of title after abandonment**

The owner of articles of personal property may terminate his ownership by abandoning it and, in that event, title passes to the first person who thereafter takes possession.

**7. Abandonment of Property § 1— owner's intent**

An essential element of abandonment is the intent of the owner to relinquish the article permanently, and it is not enough that the custodian into whose hands the owner entrusted it intentionally discarded it.

**8. State § 2.1— abandonment of records by sovereign—discarding of records by clerk of court**

Evidence that, in times past, there have been instances in which clerks of court in North Carolina, in order to provide filing and storage space for new documents, have removed from their offices and discarded old records, does not establish abandonment of such property by the sovereign so as to confer upon the first taker thereof a title good against the sovereign.

---

State v. West

---

9. **Trover and Conversion § 1; State § 2.1— possession of sovereign's documents —conversion**

The *bona fides* of a person taking documents owned by the sovereign into his possession or of a subsequent purchaser for value from him, whether on the open market or otherwise, would not confer good title upon such taker or subsequent purchaser, but, on the contrary, such purchaser, himself, regardless of his having acted in good faith, became a converter liable to the true owner.

10. **Abandonment of Property § 1; State § 2.1— indictments issued in 1767 and 1768—discard by clerk—no abandonment by sovereign**

Even if bills of indictment issued in 1767 and 1768 were intentionally thrown away by the clerk of court, such action by the clerk would not constitute an abandonment by the sovereign of its property in the absence of a showing that the sovereign authorized it or, with knowledge of it, ratified it.

11. **State § 2.1— indictments issued in 1767 and 1768—State's right to possession**

The State established its right to the possession of bills of indictment issued in 1767 and 1768 where title to the bills of indictment was shown to have been in the State, as successor to the King of England, and there was no showing that the State, or the sovereign under whom it claims, intentionally abandoned the property or authorized a transfer of its possession by the custodian whose official duty it was to keep the documents in his possession.

Justice COPELAND dissenting.

Justice MOORE joins in the dissenting opinion.

APPEAL by defendant from the Court of Appeals, which reversed the judgment entered by *Webb, J.,* who denied the State's motion for summary judgment and dismissed the action with prejudice, *Britt, J.,* dissenting from the decision of the Court of Appeals, which is reported in 31 N.C. App. 431, 229 S.E. 2d 826.

In 1767 and 1768, William Hooper, who later signed the Declaration of Independence on behalf of North Carolina, was the Attorney for the King. In that capacity, he signed and filed in the King's Court for the District of Salisbury, North Carolina, two indictments, one charging John Parker "late of the County of Rowan," with "an assault upon one Daniel Clary," the other charging "William Nelson and Willis Smith both of the County of Anson in the District of Salisbury" with an assault "upon one James White." The cases were duly brought to trial and the defendants were found not guilty.

On 7 February 1975, more than two hundred years later, the State instituted this civil action against B. C. West, Jr., a resident of Pasquotank County, in the Superior Court of that county, to recover possession of the two indictments. The State alleged in its complaint that it is the lawful custodian of and has the right to possession of all public records, including court records and documents, of the State of North Carolina; that the defendant is wrongfully in possession of the said indictments, which are such public records, and has refused the State's demands to surrender them to the State. The defendant filed answer admitting his possession of the documents but denying the State's right thereto, alleging that he is the owner of them. The authenticity of the two documents is not questioned.

The matter came on for hearing before Webb, J. without a jury. He gave judgment for the defendant, setting forth therein the following findings of fact and conclusions of law:

## FINDINGS OF FACT

"1. The defendant, a resident of Pasquotank County, North Carolina, for valuable consideration and in good faith, purchased from Charles Hamilton Galleries, Inc. of New York, NY, two Bills of Indictment. These documents originated at a time when North Carolina was a province subject to the authority of England. They were filed in the Salisbury District Superior Court and are dated March 23, 1767, and September 5, 1768, respectively. They were signed by William Hooper as Attorney for the King. William Hooper subsequently was one of the North Carolina signers of the Declaration of Independence.

"2. The defendant was in possession of said two documents at the time of the institution of this action. Prior to the defendant's acquiring them, they were in the possession of private individuals or institutions and, like many other historical documents which were at one time public records, were the subject of trading between collectors.

"3. The evidence in this case is that the two Bills of Indictment were docketed in the Salisbury District Superior Court shortly after they were drawn in 1767 and 1768 respectively. There is no evidence as to how long they stayed on file with the Salisbury District Superior Court or

any of its successor courts or as to how either of the two Bills of Indictment were removed from the court.

"4. There is no evidence, other than the docketing, that either of the two Bills of Indictment have been in the possession of the Province of North Carolina, the State of North Carolina or any of its agencies since 1767 and 1768 respectively.

"5. Although statutory provisions governing the custody of court records for the Province and the State of North Carolina have never specifically permitted the removal of bills of indictment from court records, this Court cannot hold as to what the officially sanctioned practices of the various clerks and other custodians of court records have been in regard to the disposition of bills of indictment in the more than two hundred years in which these documents have been in existence.

### CONCLUSIONS OF LAW

"1. This Court cannot hold that in the more than two hundred years existence of each of these Bills of Indictment that either of them left the possession of the Salisbury District Superior Court or any of its successors in any irregular manner.

"2. The defendant has possession of the documents which he obtained in good faith. The State of North Carolina has not overcome the presumption of title which arises in the defendant's favor through his possession of the documents.

"3. The plaintiff is not the owner of the two Bills of Indictment described in the Complaint.

"4. Said documents are owned by the defendant and he is entitled to the possession thereof."

By an act of the Colonial Assembly of North Carolina in 1766, the Chief Justice was empowered to appoint clerks of the Superior Court who were required to give bond for the safekeeping of records and the faithful discharge of their duties. By an act of the Assembly in 1760, the Salisbury District Superior Court was designated a court of record. The Colonial District Superior Courts were closed in 1773. State District Su-

perior Courts were opened in 1778, the Act of 1777 providing for the continuation of causes from the dockets prior to 1773. State District Superior Courts were replaced by County Superior Courts in 1806, statutory provision was then made for the transfer and transition of records from the former to the latter and the clerks of the District Superior Courts were constituted clerks of the County Superior Courts. Upon the adoption by the State in 1868 of the Code of Civil Procedure, the clerks of the then new Superior Courts received all the records, books, papers and properties of the former County Superior Courts. By the Public Laws of 1903, the State Historical Commission was established and charged with the duty of collecting valuable documents pertaining to the history of the State.

The evidence offered by the defendant, in addition to the foregoing historical data which was set forth in the State's answers to the defendant's interrogatories, is to the following effect:

The State does not know when the two bills of indictment, which are the subject of this action, were last in the possession of an officer of the court or how the State, or the officers of the court, lost the possession thereof. Since 1903, it has been the policy of the State to permit the discarding or destroying of some official papers but the witness so testifying was unable to say whether "someone in the State of North Carolina since 1903 exercised a discretion which resulted in the discarding of any bills of indictment." There is a large national and international market in which documents of historical significance, including documents which were once public documents, are purchased and sold. There are now in the possession of private institutions documents which formerly were public records of North Carolina. Some of the other indictments originally filed in the Salisbury District Superior Court, from 1767 to 1770, are presently in the custody of the State Division of Archives and History, which received them from the Clerk of the Superior Court of Rowan County in 1959.

The defendant is a private collector of manuscripts of historical significance. As such, he acquired the two bills of indictment in controversy in 1974 at an auction sale in New York City conducted by the Charles Hamilton Galleries which sold them for Robert Loy of East Bend, North Carolina. Mr. Loy, in turn, purchased them from J. H. Knight of Winston-Salem,

North Carolina, and from the Greensboro Historical Museum in 1972. There is no evidence in the record as to when or from what source either of these vendors acquired the documents. Documents which were formerly public documents are frequently purchased and sold in the market by private collectors and institutions, such as libraries.

*Rufus L. Edmisten, Attorney General, by T. Buie Costen, Special Deputy Attorney General, and Thomas M. Ringer, Jr., Former Assistant Attorney General, for the State.*

*Leroy, Wells, Shaw, Hornthal, Riley & Shearin, P. A., by Dewey W. Wells for defendant appellant.*

*Kirkland & Ellis by William D. North, attorney for American Library Association, Amicus Curiae.*

*Corinne A. Houpt, Assistant University Counsel, Duke University, Amicus Curiae.*

*Henry Bartholomew Cox, Amicus Curiae.*

LAKE, Justice.

The fact that William Hooper, who signed the bills of indictment which are the subjects of this lawsuit, subsequently also signed the Declaration of Independence gives to these documents the greater part of their present intrinsic value, but that circumstance has no bearing upon the principles of law which must govern our decision. The record shows that, at the present time, other bills of indictment, filed in the Superior Court of Justice for the Salisbury District at about the same time, have remained in the custody of county or State officials and are now held by the Division of Archives and History. If the subject of this lawsuit were one of those documents, signed by a King's Counsel, whose name and professional prominence are now somewhat obscure in the mists of our Colonial history, the governing legal principles would be the same as those to which we must turn for guidance in this action.

[1] Although the defendant, in his answer, pleaded the three year statute of limitations in bar of the right of the State to recover, he does not, on this appeal, rely upon that statute. In this he is well advised. First, nothing in the record indicated when the documents were taken from the possession of the State and so the record does not show when the State's cause of action

State v. West

for their recovery arose. Second, the statute so pleaded by the defendant does not apply to this action by the State.

Notwithstanding the provisions of G.S. 1-30, which states, "The limitations prescribed by law apply to civil actions brought in the name of the State, or for its benefit, in the same manner as to actions by or for the benefit of private persons," this Court said in *Raleigh v. Bank*, 223 N.C. 286, 26 S.E. 2d 573 (1943), "It has been uniformly held that no statute of limitations runs against the State, unless it is expressly named therein." In that case, the Court held that a civil action to foreclose a street assessment lien was barred by the ten year statute of limitations for the reason that the legislative intent to make such suit subject to such limitation "sufficiently appears." The three dissenting justices took issue with the majority on the latter point. They expressly said:

"The majority opinion contains these pronouncements: (1) The policy of the State as established over the years is expressed in the maxim *nullum tempus occurrit regi*, which 'is still regarded as the expression of a sound principle of government.' (2) It has been uniformly held that 'no statute of limitations runs against the State unless it is expressly named therein.' (3) The Act of 1929, Chapter 331 [the statute deemed by the majority to impose a limitation upon the bringing of such action], is 'lacking in that degree of precision ordinarily to be found in restrictive statutes.' With these premises, we are all in accord."

As the majority, speaking through Justice Devin, later Chief Justice, said in *Raleigh v. Bank, supra*, whether there ought to be a statute of limitations applicable to suits by the State is a matter for the Legislature, not the courts.

Likewise, the relative merits of private collectors of and speculators in documents relating to the history of the State, as compared to archivists employed by the State, in the matter of preserving such documents and making them available to the public for respectful inspection and scholarly research is not determinative of the present appeal. That is also a matter for consideration of the Legislature in determining the State's policy concerning the collection and preservation of such papers. Our concern in the determination of this appeal is solely with the determination of the property right of the State in the two

documents here in question. We are not here concerned with the collection and retention of documents private in origin.

By Chapter I of the Acts of the Colonial Assembly of North Carolina in its 1766-1767 Session, the State was divided into six districts (Wilmington, Newbern, Edenton, Halifax, Hillsborough and Salisbury) for each of which the act provided for the establishment of "a Court for the trial of causes, civil and criminal * * * by the name of the Superior Court of Justice." The act provided that each such court "shall have, use, exercise, and enjoy, the same powers and authorities, rights, privileges, and preheminencies (sic), as are had, used, exercised, and enjoyed, by the Chief Justice or any of his Majesty's Justices of the Courts of Westminster in England." The act further authorized the Chief Justice to appoint "experienced and discreet Clerks of the Superior Courts; who shall, each of them, give bond * * * to our Sovereign Lord the King, his heirs and successors * * * for the safekeeping of the records and faithful discharge of his duty in office." The act further provided, "[T]hat for the more entire and better preservation of the records of causes, when any cause is finally determined, the clerk shall enter all the proceedings therein, and other matters relating thereto, in a book, well bound, so that an entire and perfect record may be made thereof." It also provided, "[T]hat all causes * * * indictments and presentments whatsoever, that are, or shall be depending in any of the late Superior Courts of Justice within this Colony * * * and not fully determined, shall be transferred and put on the dockets of the respective Superior Courts hereby established."

It is apparent that the Colonial Assembly recognized the importance of maintaining records of court proceedings, civil and criminal, and of collecting and preserving in a public office documents relating thereto. Obviously, the bills of indictment charging criminal offenses upon which the Colonial subjects of the King were to be tried in his Court were among the papers so designed to be collected and preserved. When a bill of indictment, prepared by the King's Counsel, was filed in the office of the clerk of such court, the paper was no longer the private property of the draftsman but became part of the records of the King's Court and, therefore, property of the King. Its subsequent retention or disposition was subject to his direction and control. Nothing else appearing, the inherent powers of his Court would include the power to order the return of its posses-

sion of a bill of indictment removed from the clerk's office without authority. Such removal could not terminate the King's title to the document, nor would his right to recover its possession be barred by the passage of time, however great, for the common law of England clearly accepted the maxim, *nullum tempus occurrit regi.*

[2]   A change of sovereignty transfers but does not alter the right of the former sovereign to his official, as distinguished from his personal, property. Thus, in 48 C.J.S., International Law, § 15, it is said: "A state which is formed out of, or which absorbs, another, succeeds to the latter's international rights and obligations. Property of the old state passes to the new one, and the former's debts are generally assumed by the latter." Thus, "Sovereignty survives changes in governments and in forms of government." 45 Am. Jur. 2d, International Law, § 40. As Justice Sutherland, speaking for the Court in *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), said: "Rulers come and go; governments end and forms of government change; but sovereignty survives. A political society cannot endure without a supreme will somewhere. Sovereignty is never held in suspense."

Officially, the War of the American Revolution ended with the signing of the Treaty of Paris on 3 September 1783 providing: "His Britannic Majesty acknowledges the said United States, viz. * * * North Carolina * * * to be free, sovereign and independent states; that he treats with them as such, and for himself, his heirs and successors, relinquishes all claims to the government, property and territorial rights of the same, and every part thereof." The treaty further provided: "His Britannic Majesty shall * * * also order and cause all archives, records, deeds and papers belonging to any of the said states, or their citizens, which in the course of the war may have fallen into the hands of his officers, to be forthwith restored, and delivered to the proper states and persons to whom they belong." The right of the State to the bills of indictment here in question does not arise from that provision of the treaty for there is nothing to indicate that these bills of indictment, "in the course of the war," fell into the hands of an officer of the King. This provision of the treaty, however, indicates clearly the intent of the King to relinquish any claim which he otherwise might have to records, such as indictments and other portions of official court records.

The defendant and the amici curiae referred in their briefs to an alleged state of "anarchy" prevailing during the War of the Revolution. Nothing in the record indicates that any disorder or unrest in the Salisbury District disturbed the records of the Superior Court of Justice therein. In any event: "Internal disorder, rebellion, or continuing civil war does not affect the existence of a nation, although foreign relations may be interrupted thereby. Even when anarchy exists for a considerable period of time, the nation continues to subsist; and so will its existence continue until its sovereignty is completely extinguished by the final dissolution of the social tie, or by some other cause which puts an end to the being of the state." 45 Am. Jur. 2d, International Law, § 14.

[3] The Treaty of Paris simply recognized the established fact of history that North Carolina was, by reason of a successful revolution, a free and independent state, and no longer a British colony. This accomplished fact, not the formal recognition of it, transferred the sovereignty in North Carolina from the King to the State. As Justice Clifford said in *United States, Lyon et al. v. Huckabee*, 16 Wall. 414, 21 L.Ed. 457 (1873); "Complete conquest, by whatever mode it may be perfected, carries with it all the rights of the former government, or in other words, the conqueror, by the completion of his conquest, becomes the absolute owner of the property conquered from the enemy, nation or State. His rights are no longer limited to mere occupation of what he has taken into his actual possession, but they extend to all the property and rights of the conquered State, including even debts as well as personal and real property. Halleck's International Law, 839; *Elphinstone v. Bedreechund*, 1 Knapp's Privy Council Cases, 329; Vattell, 365; 3 Phillmore's International Law 505."

In *United States v. McRae* [1869], L.R. 8 Eq. 69, the United States sued in the English courts to gain possession of funds which previously belonged to the Confederate States of America. Vice Chancellor James said:

"I apprehend it to be clear public universal law that any government which *de facto* succeeds to any other government, whether by revolution or restoration, conquest or reconquest, succeeds to all the public property to everything in the nature of public property, and to all rights in respect to the public property of the displaced power, whatever

may be the nature or origin of the title of such displaced power. Any such public money in any treasury, any such public property found in any warehouses, forts, or arsenals, would, on the success of the new or restored power, vest *ipso facto* in such power; and it would have the right to call to account any fiscal or other agent, or any debtor or accountant to or of the persons who had exercised and had ceased to exercise the authority of a government, the agent, debtor, or accountant having been the agent, debtor or accountant of such other persons in their character or pretended character of a government. But this right is the right of succession, is the right of representation, is a right not paramount, but derived, I will not say under, but through, the suppressed and displaced authority, and can only be enforced in the same way, and to the same extent, and subject to the same correlative obligations and rights as if that authority had not been suppressed and displaced, and was itself seeking to enforce it."

[4]  Thus, the turmoil and confusion incident to the War of the Revolution did not terminate the title of the sovereign to the bills of indictment here in question or defeat his right to the possession thereof, nor did it suspend sovereignty. The succession of the new sovereign was instantaneous for there is no gap in sovereignty. The proclamation and formal recognition of the new sovereign is not essential to such transfer of the properties of the old sovereign to the new. This is the meaning of the classical pronouncement, "The King is dead; long live the King."

[5]  We need not determine the precise time at which the State of North Carolina succeeded to the sovereign rights of King George III. At some time, between the creation of the latter's right in and to these indictments and the signing of the Treaty of Paris, that succession occurred and the properties of the King, including these documents, whether then in or out of possession of his custodian, passed automatically to the State.

The defendant relies upon the doctrine of abandonment. In *Church v. Bragaw,* 144 N.C. 126, 56 S.E. 688 (1907), this Court, speaking through Justice Walker, said:

"The word 'abandonment' has a well defined meaning in the law which does not embrace a sale or conveyance of the property. It is the giving up of a thing absolutely, without reference to any particular person or purpose, and

includes both the intention to relinquish all claim to and dominion over the property and the external act by which this intention is executed, and that is, the actual relinquishment of it, so that it may be appropriated by the next comer. 1 Cyc., 4. 'Abandonment must be made by the owner without being pressed by any duty, necessity or *utility* to himself, but simply because he desires no longer to possess a thing; and, further, it must be made without a desire that any other person shall acquire the same; for if it were made for a consideration, it would be a barter or sale, and if without consideration, but with an intention that some other person should become the possessor, it would be a gift.' *Stephens v. Mansfield,* 11 Cal., 363."

[6] Thus, the owner of articles of personal property may terminate his ownership by abandoning it and, in that event, title passes to the first person who thereafter takes possession. 1 Am. Jur. 2d, Abandoned, Lost and Unclaimed Property, § 18. However, an essential element of abandonment is the intent of the owner to relinquish the article permanently. "An abandonment must be made to appear affirmatively by the party relying thereon and the burden is upon him who sets up abandonment to prove it by clear, unequivocal, and decisive evidence." 1 Am. Jur. 2d, Abandoned, Lost and Unclaimed Property, § 36.

[7, 8] It is the owner who must have the intent so to terminate his title. Thus, it is not enough that the custodian into whose hands the owner entrusted it intentionally discarded it. Here, as in other modes of disposing of property, an owner may act through an agent, but to deposit an article with an agent for safekeeping obviously does not imply authority in the agent to discard it. Nothing in the record indicates a grant by King George III, or by the State of North Carolina, to the Clerk of the Superior Court of Justice of the Salisbury District, or his successor in office by that or any other title, to throw away these documents committed to his custody. On the contrary, the above mentioned act of the Colonial Assembly required that the clerk give bond "for the safekeeping of the records." Obviously, neither careless disregard nor intentional misconduct by the clerk will show an intent by the owner of the documents in question to abandon them. It is even more obvious that unauthorized removal of the documents from the office of the clerk by a third person, with or without the knowledge and consent of the clerk, whether or not a state of unrest bordering on

anarchy prevails in the community, does not show an intent by the owner to abandon his property. Thus, the evidence in the record that, in times past, there have been instances in which clerks of courts in North Carolina, in order to provide filing and storage space for new documents, have removed from their offices and discarded old records, does not establish abandonment of such property by the sovereign so as to confer upon the first subsequent taker thereof a title good against the sovereign. In this respect, the sovereign is like any other owner of property.

The defendant and the amici curiae contend that the greater probability is that these indictments were so thrown away by the Clerk of the Superior Court of Justice for the Salisbury District, or some successor to him, during the period of unrest while the War of the Revolution was in progress, or at some later date when these papers were regarded as of no further consequence. It would seem more likely that they were intentionally removed from the clerk's office in more recent times, when discovered by one who was aware of their intrinsic value by reason of the presence thereon of the signatures of William Hooper, a signer of the Declaration of Independence. The fact that other, contemporaneous records of the Superior Court of Justice of the Salisbury District still remain in the possession of the State tends to negate the supposition of the defendant that the documents here in question were intentionally discarded by the clerk of the court, or his successor in office, in order to make room for newer documents.

[9] In either event, the *bona fides* of the person taking the documents into his possession, or of a subsequent purchaser for value from him, whether on the open market or otherwise, would not confer good title upon such taker, or subsequent purchaser, but, on the contrary, such purchaser, himself, regardless of his having acted in good faith, became a converter liable to the true owner. *Wall v. Colvard, Inc.*, 268 N.C. 43, 149 S.E. 2d 559 (1966); 18 Am. Jur. 2d, Conversion, § 7. Furthermore, these documents, being bills of indictment, bear upon their face notice to all the world that they were part of the court records of the Colony of North Carolina and, therefore, the property of the State. See: *Mayor of the City of New York v. Lent*, 51 Barb. 19 (1868).

[10] In his brief, the defendant relies upon the presumption that the Clerk of the Superior Court of Justice of the Salisbury District, and his successors, being public officials, have properly performed their duties. Since their duty included the safekeeping of the court records, including these indictments, this presumption would not support the defendant's theory that these documents were intentionally thrown away by the clerk, but even if they were, such action by him would not constitute an abandonment by the sovereign of its property in the absence of a showing that the sovereign authorized it or, with knowledge of it, ratified it. There is nothing in the record to indicate either such prior authority or subsequent ratification. Such authorization or ratification cannot be presumed.

In 66 Am. Jur. 2d, Records and Recording Laws, § 10, it is said:

"Public records and documents are the property of the State and not of the individual who happens, at the moment, to have them in his possession; and when they are deposited in the place designated for them by law, there they must remain, and can be removed only under authority of an act of the Legislature and in the manner and for the purpose designated by law. The custodian of a public record cannot destroy it, deface it, or give it up without authority from the same source which required it to be made. Thus, an indictment duly filed cannot be removed legitimately by anyone, including the District Attorney, except for purposes of the trial thereon, or for purposes of evidence under a subpoena duces tecum or an order of court."

[11] Title to the bills of indictment in question having been shown to have been in the State, as successor to the King of England, there being no showing that the State, or the sovereign under whom it claims, intentionally abandoned the property, or authorized a transfer of its possession by the custodian whose official duty it was to keep the documents in his possession, and the right of the State to maintain this action not being barred by the lapse of time, the State has established its right to the possession of the documents and the judgment of the Court of Appeals, reversing that of the Superior Court, was correct.

Neither this Court nor any other has authority to direct reimbursement of the defendant for expense incurred in acquiring or maintaining his possession thereof in good faith, thus preserving it from destruction or loss. If such claim is meritorious, the Legislature, and it alone, may authorize the use of State funds for such purpose.

Affirmed.

Justice COPELAND dissenting.

Reluctantly, I must dissent from the scholarly opinion of the majority.

The State brings this action to recover two bills of indictment signed by William Hooper, one of the three signers of the Declaration of Independence on behalf of North Carolina. The State having brought the action must carry the burden of proof to establish title to the documents. The State has shown that there were two bills of indictment signed by William Hooper in 1767 and 1768. The only other thing that has been shown by the State is their presence in private hands over 206 years later. What happened to them in the meantime is just one big question mark.

It is well known that most of the discoveries of old papers and records are made by private citizens. To permit the State to ride freely on the backs of private individuals and libraries who have expended their efforts and money to recover and preserve these documents and records, without any reimbursement, does not strike me as fair. The net result of the majority opinion will be to drive documents and records underground and out of the State. I do not consider this good public policy.

I believe the dissenting opinion of Judge Britt of the Court of Appeals puts this case in the proper perspective. Since the State has failed to carry the burden of proof in this instance, I would reverse the Court of Appeals and affirm the trial court.

Justice MOORE joins in this dissenting opinion.