An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-717

NORTH CAROLINA COURT OF APPEALS

Filed: 31 December 2014

VALLEY PROTEINS, INC.,

    Plaintiff,

    v.

ECO-COLLECTION SYSTEMS, LLC AND
ACE WRECKER SERVICE, INC.,

    Defendants.

Cumberland County
No. 12 CVS 2387

Appeal by plaintiff from order entered 25 November 2013 by Judge Gary Trawick in Cumberland County Superior Court. Heard in the Court of Appeals 17 November 2014.

> *Andrew M. Jackson and Stevens Martin Vaughn & Tadych, PLLC, by K. Matthew Vaughn, for plaintiff-appellant.*

> *Burton, Sue & Anderson, L.L.P., by Gary K. Sue and Cam A. Bordman, for defendant Eco-Collection Systems, LLC.*

HUNTER, Robert C., Judge.

Valley Proteins, Inc. ("plaintiff" or "VPI") appeals from an order granting summary judgment for defendant Eco-Collection Systems, LLC ("ECS")[1] on: (1) plaintiff's claims for trespass to

---

[1] VPI's claims against defendant Ace Wrecker Service, Inc. ("Ace") were voluntarily dismissed on 28 October 2013. Ace is

chattels, conversion, unjust enrichment, and unfair and deceptive practices; and (2) defendant's counterclaims for trespass to chattels, conversion, unjust enrichment, unfair and deceptive practices, and tortious interference with contract. On appeal, plaintiff argues that genuine issues of material fact exist to preclude summary judgment for defendant, or in the alternative, that plaintiff is entitled to judgment as a matter of law.

After careful review, we reverse the trial court's order granting summary judgment for ECS, vacate the remaining judgment and order, and remand this matter for trial.

## Background

VPI and ECS are competitors in the restaurant grease recycling industry. VPI has been in business since 1948 and currently serves customers throughout the United States. VPI contracts orally and in writing with restaurants to purchase waste grease and oil to recycle these substances for useful purposes, such as bio-diesel fuel. After entering into an exclusive removal agreement, VPI will furnish a container to its customer to store the grease. The containers are marked with serial numbers and a sticker indicating that the container and

---

not a party to this appeal.

its contents are the property of VPI, consistent with industry custom. VPI employees then check on the customer every two to four weeks to empty the containers of grease.

In 2007, VPI began noticing that its grease and containers were being stolen. James Katsias ("Katsias"), Assistant Director of Procurement for VPI, testified in deposition that VPI began receiving letters from unknown sources asserting that VPI's customers were using another vendor and that VPI had five or ten days to remove their grease containers before they would be considered "abandoned." He further testified that the date on the letter was typically "post-dated," such that the five or ten day period would have already passed by the time VPI actually received the letter; oftentimes VPI received the letters after its containers had already been removed.

Around this time, ECS began soliciting business from VPI's customers. Cameron Calhoun ("Calhoun"), founder and co-owner of ECS, testified in deposition that ECS hired independent contractors to conduct the company's sales. According to Calhoun, it was ECS's policy to ask potential new customers whether they were under contract with any other grease removal service providers; if they indicated that they were under contract, ECS would not pursue their business. However, Calhoun

also acknowledged that many of the customers ECS solicited had VPI containers outside their building. When ECS would convince one of VPI's prior customers to switch service providers, ECS would send VPI cancellation letters indicating that the customer no longer wanted VPI's business. Calhoun testified to this arrangement as follows: "[W]e came up and actually decided that we were going to try to come up with a method to notify the competitor properly, and if the competitor didn't comply with that notification letter, the container could be removed[.]" According to Calhoun, ECS would wait 60 days after sending the initial cancellation letters before arranging for VPI's containers to be removed. If VPI had taken no action to remove their containers, ECS would then send each customer a Consent to Tow form, executed between the restaurant owner and Ace, authorizing Ace to tow VPI's containers away. ECS coordinated with Ace to pump any grease out of VPI's containers before Ace would remove them.

Felton Hairr, an employee of VPI, testified that he received the letters and Consents to Tow at VPI's Rose Hill office. Hairr testified that he was given authority from his superior at VPI to handle the letters at Hairr's discretion.

Hairr generally filed the letters away, but sometimes threw them into the garbage.

Benjamin Sylvester, an employee of ECS, testified in deposition that in May 2011, ECS contacted Ace to tow one of VPI's containers from Nashville Diner. According to Sylvester, ECS had mailed a cancellation letter signed by the restaurant owner to VPI and waited either 30 or 60 days before having forwarded the Consent to Tow form to Ace to have them retrieve VPI's container. When the Ace employee arrived at Nashville Diner, the restaurant owner "went ballistic," denying that it was his signature on ECS's forms and claiming that he did not want VPI's container to be towed. The restaurant owner then called Hairr to report the issue, who contacted his superiors at VPI. According to Katsias, another customer reported that an individual showed up at a restaurant representing himself as a VPI employee to swap out containers. However, when the restaurant owner read the form purporting to be from VPI, he discovered that it was actually a contract with ECS.

VPI's President and CEO J.J. Smith ("Smith") met with ECS representatives in mid-2011 and informed them that VPI intended to reclaim any of its containers that ECS had taken. ECS claimed that the containers had become property of ECS by virtue

of paying a "junk price" to Ace. In June 2011, VPI instructed its field workers to be on the lookout for any of VPI's containers that may have been missing. A procurement representative for VPI filed an affidavit in which he claimed that three 300-gallon containers belonging to VPI had been recovered; the containers had been repainted and relabeled as property of ECS, but VPI's company labels could still be seen underneath.

VPI filed a complaint in Cumberland County Superior Court against ECS, alleging claims for trespass to chattels, conversion, unjust enrichment, and unfair and deceptive practices. ECS filed counterclaims for the same causes of action in addition to tortious interference with contract. Both parties moved for summary judgment, and those motions were heard on 14 October 2013. On 25 November 2013, the trial court entered an order denying VPI's motion for summary judgment and granting summary judgment for ECS on both VPI's claims and ECS's counterclaims. The case then proceeded to trial on the issue of damages. The trial court entered judgment on 5 February 2014, finding damages in the amount of $1,491.85 on ECS's counterclaims of conversion and trespass to chattels, which were trebled to $4,475.55. ECS was also awarded $2,423.00 in costs

and $15,095.00 in attorneys' fees.  VPI filed timely notice of appeal.

## Discussion

### I. Summary Judgment

VPI argues that the trial court erred by denying its motion for summary judgment and granting summary judgment for ECS on all claims.  We conclude that genuine issues of material fact exist to preclude summary judgment for either party.

"This Court reviews orders granting summary judgment de novo."  *Foster v. Crandell*, 181 N.C. App. 152, 164, 638 S.E.2d 526, 535 (2007).  Summary judgment is appropriate "only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (internal quotation marks omitted).  The burden of proof rests with the movant to show that summary judgment is appropriate.  *Development Corp. v. James*, 300 N.C. 631, 637, 268 S.E.2d 205, 209 (1980).  We review the record in the light most favorable to the non-moving party.  *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975).

"The tort of conversion is well defined as an unauthorized assumption and exercise of the right of ownership over goods or

personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (internal quotation marks omitted). The two essential elements of a conversion claim are ownership of the property by the plaintiff and a wrongful possession or conversion by the defendant. *Gadson v. Toney*, 69 N.C. App. 244, 246, 316 S.E.2d 320, 321–22 (1984). Similarly, "[a] successful action for trespass to chattel requires the party bringing the action to demonstrate that she had either actual or constructive possession of the personalty or goods in question at the time of the trespass, and that there was an unauthorized, unlawful interference or dispossession of the property." *Fordham v. Eason*, 351 N.C. 151, 155, 521 S.E.2d 701, 704 (1999) (citation omitted). Acts of conversion may constitute unfair or deceptive practices under N.C. Gen. Stat. § 75-1.1 (2013), so long as the required additional "egregious, immoral, oppressive, unscrupulous, or substantially injurious acts" are established and proven to the satisfaction of the judge or jury, *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co., Inc.*, 192 N.C. App. 74, 83, 665 S.E.2d 478, 487 (2008).

Here, ECS relies on the affirmative defense of abandonment to support its contentions that not only do VPI's claims fail, but VPI is liable to ECS for reclaiming the containers ECS refurbished.[2] "[T]he owner of articles of personal property may terminate his ownership by abandoning it and, in that event, title passes to the first person who thereafter takes possession." *State v. West*, 293 N.C. 18, 30, 235 S.E.2d 150, 157 (1977).

> The word "abandonment" has a well defined meaning in the law which does not embrace a sale or conveyance of the property. It is

---

[2] VPI argues that ECS waived the affirmative defense of abandonment and denied in its answer that it would pursue the defense of abandonment. Because VPI failed to raise these arguments at the trial level, they are deemed abandoned on appeal. *See Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 348, 712 S.E.2d 328, 332 (2011). Assuming *arguendo* that these contentions were preserved for appellate review, we remain unpersuaded. This Court has held that, absent prejudice to the plaintiff, "an affirmative defense may be raised by a motion for summary judgment regardless of whether it was pleaded in the answer or not." *County of Rutherford ex rel. Hedrick v. Whitener*, 100 N.C. App. 70, 74, 394 S.E.2d 263, 265 (1990) (internal quotation marks omitted). Because ECS raised the defense of abandonment at the hearing on the motions for summary judgment, we conclude that it has not waived this argument and plaintiff has suffered no prejudice. Additionally, ECS's denial of Paragraph 20 in the amended complaint does not equate to a judicial admission that ECS would not pursue the defense of abandonment. Paragraph 20 referred to the defense of abandonment as a "fabricated rationale to justify its conversion and theft of the property of another." We find that ECS's denial of this characterization is consistent with its intent to pursue the defense of abandonment at the hearing for summary judgment and on appeal.

> the giving up of a thing absolutely, without reference to any particular person or purpose, and includes both the intention to relinquish all claim to and dominion over the property and the external act by which this intention is executed, and that is, the actual relinquishment of it, so that it may be appropriated by the next comer.

*Id.* at 29-30, 235 S.E.2d at 156-57 (quoting *Church v. Bragaw*, 144 N.C. 126, 56 S.E. 688 (1907)).

Consistent with the idea that "the question of abandonment is almost always a fact question for the jury," *Kitchen v. Wachovia Bank & Trust Co., N.A.*, 44 N.C. App. 332, 334, 260 S.E.2d 772, 773 (1979), we find that there are genuine issues of material fact regarding whether VPI had the intention to "relinquish all claim to and dominion over" its containers that precludes summary judgment for either party, *West*, 293 N.C. at 30, 235 S.E.2d at 157. The amount of time that VPI waited before taking action to reclaim its containers is in dispute. Calhoun alleged in his affidavit that ECS would not send a Consent to Tow to Ace until approximately 60 days had passed after sending VPI a cancellation letter. However, Katsias testified that VPI's containers were often missing before VPI even received a corresponding cancellation letter. He also testified that when VPI would receive the letters purporting to inform them that they had abandoned their containers, VPI would

try to call the customer to ask about the letters and ensure that they still maintained a relationship with VPI. Hairr testified that VPI serviced all of its containers on either a two- or four-week cycle in order to empty the grease. All of this evidence serves to refute the contention by ECS that VPI "did nothing" to the containers during the alleged 60-day interim between receiving the cancellation letters and having the containers towed.

Because these facts are in genuine dispute, defendant's reliance on *National Advertising Co. v. North Carolina Dept. of Transp.*, 124 N.C. App. 620, 478 S.E.2d 248 (1996), is misplaced. In *National Advertising Co.*, the issue was whether the North Carolina Department of Transportation ("DOT") was liable for reverse condemnation where it removed an advertising sign owned by the plaintiff from land that the DOT had recently purchased. *Id.* at 622-23, 478 S.E.2d at 249. Citing 51C C.J.S. *Landlord and Tenant* § 317(b) (1968), the Court held that where the plaintiff did not have a leasehold interest in the land from which the sign was removed and it was given 90 days' notice to remove the sign but failed to do so, "it effectively abandoned its sign." *Id.* at 625, 478 S.E.2d at 250. Here, unlike in *National Advertising Co.*, there are no issues regarding any

potential landlord-tenant relationships, VPI asserts that it had exclusive oral and written agreements with the restaurants, and the timing regarding VPI's receipt of the purported cancellation notices and the containers' removal is in dispute.[3] Thus, we find *National Advertising Co.* inapposite.

Furthermore, although Hairr testified in deposition that he generally ignored the cancellation letters, going as far as to throw them away in some circumstances, we do not believe that this fact alone settles the issue of whether VPI unequivocally intended to abandon the containers it uses to conduct its business, as ECS contends. VPI presented evidence that it called the restaurant owners after receiving the cancellation letters and put forth efforts to stop what it perceived to be an increase in the theft of their containers and grease.

---

[3] Additionally, the authenticity of the purported cancellation letters and Consents to Tow are in genuine dispute. ECS claims that it had duly executed cancellation notices and Consent to Tow forms for every grease container that was towed from the restaurants' premises. However, undisputed evidence was presented that when ECS attempted to have Ace remove VPI's container from Nashville Diner, the owner of the restaurant refuted that it was his signature on the contract. Additionally, Katsias testified that on at least one occasion, an individual arrived at a restaurant purporting to be a representative of VPI, but in fact attempted to have the restaurant owner sign a contract with ECS. Given these factual discrepancies, we reject ECS's argument that summary judgment was appropriate for the restaurant owners to enjoy the use of their private property.

Specifically, Smith testified in deposition that VPI hired an in-house attorney to help VPI fight grease and container theft, as that problem had increased in the last five years. Additionally, Smith testified that he told Calhoun that VPI did not intend to relinquish ownership over its missing containers, and VPI presented evidence that it searched for and reclaimed three containers that ECS had towed and refurbished for its own use.

In sum, VPI and ECS presented conflicting evidence on almost every relevant aspect of ECS's defense of abandonment. "An abandonment must be made to appear affirmatively by the party relying thereon and the burden is upon him who sets up abandonment to prove it by *clear, unequivocal, and decisive evidence*." *West*, 293 N.C. at 30, 235 S.E.2d at 157 (emphasis added) (quotation marks omitted). Because there are genuine issues of material fact regarding whether VPI had the intention to abandon its containers, we hold that summary judgment for ECS was improper. *See Kitchen*, 44 N.C. App. at 334, 260 S.E.2d at 773; *see also Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164-65 (1975) ("Summary judgment should be entered only where there is no genuine issue as to any material fact.").

## Conclusion

Because genuine issues of material fact exist as to VPI's claims and ECS's counterclaims, we reverse the trial court's order granting summary judgment for ECS, vacate the judgment and order awarding damages, costs, and attorneys' fees, and remand this matter for further proceedings.

REVERSED, VACATED, AND REMANDED.

Chief Judge McGEE and Judge BELL concur.

Report per Rule 30(e).