This appeal arises out of an interpleader action commenced in the Montgomery County Circuit Court to determine the right to royalties from the production of natural gas in offshore waters adjacent to Dauphin Island. The trial court entered a summary judgment, which we affirm.
This action began in February 1994, when Callon Offshore Production, Inc.; CN Resources; *Page 946 
and Callon Consolidated Partners, Ltd. (collectively "Callon"), filed a "Complaint for Declaratory Judgment and in Interpleader." The complaint named a large number of defendants, including West Dauphin Limited Partnership (hereinafter "West Dauphin" as collectively including not only that entity but all its predecessors in title) and Atlantic Richfield Company. The list of defendants also included the State of Alabama, the Alabama Department of Conservation and Natural Resources, and "Charley" Grimsley, as Commissioner of Conservation and Natural Resources (collectively "the State").
Atlantic Richfield and Mobil Oil Exploration Producing Southeast, Inc. ("Mobil") drilled producing gas wells on certain offshore tracts adjacent to Dauphin Island. The drilling operations were accomplished pursuant to oil and gas leases the State had granted Atlantic Richfield and Mobil. Subsequently, these leases were assigned to Callon, which now operates the wells on the offshore tracts.
The complaint alleged that a dispute had arisen over the proceeds of Callon's operations on the submerged lands. The dispute consisted of conflicting claims by the State and West Dauphin to ownership of submerged land lying generally along a line intersecting "portion[s] of Offshore Tracts 72, 73, and 91, and the Northeast Quadrant of Offshore Tract 90 (all as designated on [a] plat entitled `State of Alabama Chart of Submerged State Lands Oil and Gas Lease Tracts')." The disputed land, which West Dauphin and Callon have labeled the "Harbor Line Property" and the "Improvement Line Property," respectively, includes the area into which the gas-producing wells were drilled. Consequently, both the State and West Dauphin claimed the right to receive "the royalties attributable to gas production from that property." Brief of Appellants, at 1. Callon suspended disbursements of the disputed funds, depositing them, instead, with the court, which opened an interest-bearing account to receive accrued and accruing royalties.
Callon's complaint sought a judgment identifying the proper payee. The State and West Dauphin cross-claimed, each asserting ownership of the Improvement Line Property and entitlement to the royalties. Subsequently, Callon moved the court to enter a summary judgment in favor of the State. That motion was granted on August 9, 1996, and West Dauphin appealed.
West Dauphin contends that it acquired title to the Improvement Line Property pursuant to Ala. Code 1975, § 33-7-53, or, at least, pursuant to § 33-7-53 in conjunction with what it alleges was a quid pro quo dedication in 1954 to public use of West Dauphin real estate and its payment since 1954 of ad valorem taxes on the Improvement Line Property. We shall address each of these claims in the following three parts of this opinion.
 I. Section 33-7-53
[1] Section 33-7-53 provides:
 "[¶ (1)] In order to encourage the building of bridges, causeways and other development work and relief work, the owner of any lands in the state of Alabama abutting on tidelands, the title to which or control of which may now or hereafter be vested in the State of Alabama, which shall not have been improved by or under valid public authority and shall not be otherwise devoted to public use, shall be authorized to acquire such tidelands and to fill, reclaim or otherwise improve same and to fill in, reclaim or otherwise improve the abutting submerged land and to own, use, mortgage and convey the lands so reclaimed, filled or improved, and any improvements thereon, under and subject to the conditions and approval herein stated.
 "[¶ (2)] Any such improvement shall conform to any harbor line established at the time of such improvement by state or federal authority having jurisdiction over such matters, or if not then already established, same shall conform to any harbor line stipulated by any such authority having jurisdiction on application by such riparian owner.
 "[¶ (3)] If such land shall be used for a bridge, road or causeway over navigable waters, or for bridgehead or approach thereto or for terminal facilities, depots, *Page 947 storage or sale yards, stores, warehouses or wharves abutting on such bridge or road or causeway, the plans for such bridge, road or causeway shall be approved by the United States engineer officers or other federal authority having jurisdiction, and by the Director of the State Docks Department and the Governor of Alabama, and when so approved and when improved pursuant to such approval the title to the said lands and the entire improvements thereon shall vest in such riparian owner without further approval when the bridge, road or causeway shall be constructed pursuant to the plans so approved.
 "[¶ 4] If such improvement constructed or proposed shall not consist of a bridge, bridgehead, road or causeway, approach or related improvement included within this section, title shall not pass to the riparian owner waking or proposing such improvement unless and until the riparian owner shall have obtained the approval of the county commission of the county in which the land is situated, and of the Director of the State Docks Department and the Governor of Alabama, on application of such owner made after publication of 10 days' notice thereof by a single publication in a newspaper published in the county in which the land is situated and shall have filed for record in the county a certificate of such approval executed and acknowledged by the presiding officer of said respective authorities."
(Emphasis added.)
At the outset of its discussion of the facts and issues, West Dauphin states: "Most of the events which give rise to this dispute occurred between 1932 and 1955." Brief of Appellants, at 5. It then directs our attention to the history of 33-7-53, stating:
 "This dispute arises from § 33-7-53, Code of Alabama (1975). This statute was introduced in the 1932 session of the Alabama Legislature as Senate Bill No. 125, also known as the `Craft Bill' after the Mobile County senator who sponsored it. The overall purpose of the bill was to promote the economic development of Dauphin Island by enabling private riparian landowners to obtain title to submerged lands adjacent to their property. More specifically, the bill was intended to enable a private corporation to acquire the lands necessary to construct a bridge from the Mobile County mainland to the island
[`the Dauphin Island Bridge']."
Brief of Appellants, at 5 (emphasis added). Because West Dauphin has thus introduced the section's connection with the Dauphin Island Bridge, and acknowledged the significance to this case of the statute's history and purpose, we shall enlarge somewhat upon those themes.
The history of the Dauphin Island Bridge and, by extension, the history of § 33-7-53, begins in the 19th century. As early as the 1880s, projects to connect Dauphin Island to the mainland by a bridge or causeway were being discussed and attempted. "Dauphin Island Bridge," The Mobile Press, October 13, 1938, at 8. By 1932, however, no such project had been accomplished. The absence of a method of funding was one of the primary obstacles proponents encountered. Newspapers from that period suggest that at least one of the objectives the proponents sought was a way to finance the project without resorting to state or county tax revenues.
In 1932, Senator John Craft, of Mobile County, introduced Senate Bill 125, which, in its final form, became Act No. 147, 1932 Ala. Acts 167, codified at Ala. Code 1975, § 33-7-53. The purpose of the bill was "to enable a private corporation to construct a bridge from the mainland of Mobile County to Dauphin Island." Letter from Gessner T. McCorvey to John H. Peach, legal advisor to the Governor, October 20, 1932. C.R. 1009-10 McCorvey further stated:
 "Of course, it will be necessary to so provide that such corporation can obtain a title to the bridge approaches which can be covered by a trust deed or mortgage securing a bond issue on the bridge. I understand that the corporation proposes to obtain a loan from the Reconstruction Finance Corporation at 3%, which loan is to be liquidated from tolls collected from the Bridge, and that the County is in no manner to be obligated for the indebtedness. *Page 948 
 "In my opinion the bill is a good one, and I think it will bring about the development of the Southern end of Mobile County, and that the enactment of this bill will result in a bridge being built at Dauphin Island.
" . . . .
 ". . . There has been a lot of controversy in this County about Dauphin Island, but all of this controversy arose out of the fact that many people felt that the County, as a County, should not become financially obligated to construct a bridge of this character in the present state of our County's treasury. However, the proposed bill imposes no obligations upon the County, but merely enables private owners to endeavor to finance a bridge to Dauphin Island, if this can be done.
 ". . . If this bill undertook to impose any obligation upon either the City of Mobile or the County of Mobile, or the State, many of us would oppose it, but in the form in which this bill has been passed by both houses, I can see no possible objection to it, as all the State is doing is saying, in effect, to the persons who wish to undertake to construct this bridge, that so far as the State is concerned, we will give you the right to build this bridge and to mortgage, to secure the cost of the construction of same, not only the bridge which you are to construct, but also such part of the approaches as may have heretofore belonged to the State, and as lie between high water and low water mark."
(Emphasis added.)
West Dauphin owned considerable portions of Dauphin Island, which stood to benefit from the construction of a bridge connecting Dauphin Island to the mainland. It did not propose to construct the bridge. West Dauphin did, however, contemplate what it describes as the "`filling and reclamation' of the [Improvement Line] Property." Brief of Appellants, at 8.
In this connection, on June 23, 1934, West Dauphin published in the Mobile Times a "Notice of Application for Establishment of Harbor Line on Dauphin Island." The application stated:
 "In accordance with a request by the State Planning Engineer of Alabama Relief Administration, Montgomery, Alabama, that a harbor line be established along the northerly shore of Dauphin Island, the undersigned riparian owners have filed or will cause to be filed application with the United States Engineer Office at Mobile, with the Governor of Alabama, the Court of County Commissioners of Mobile County, and with the Alabama State Docks Commission, for their concurrence in the establishment of such harbor line, and will request action accordingly on or after the 9th day of July, 1934.
 "This notice is given pursuant to the act of the Legislature of Alabama No. 147, approved October 26, 1932."
Four years later, West Dauphin submitted to the Board of Revenue and Road Commissioners of Mobile County ("the Board"), an application, stating as follows:
 "The undersigned, on behalf of themselves and all other riparian owners of land upon Dauphin Island and Little Dauphin Island abutting upon Dauphin Bay and Mississippi Sound, separately and severally respectfully represent that publication was heretofore made more than ten days prior to the presentation thereof of intention to apply for the approval by you contemplated by Act No. 147, approved October 26, 1932[and] that they desire approval under said Act, of shore line for filling, reclamation, use and disposition as contemplated by said Act, along and in front of their respective riparian holdings now owned or hereafter acquired, within the lines indicated on the print hereto attached. . . .
"The undersigned respectfully request a certificate of approval accordingly."
The Board "defer[red] action on the application" for study by legal counsel.
On December 9, 1938, John R. Peavy, as "maintenance engineer" for the State of Alabama Highway Department, addressed a letter to West Dauphin, stating in pertinent part:
 "The County Attorney, Jansen, and members of the County Board assured me this morning that the Resolution with *Page 949 
reference to the Harbor Lines on Dauphin Island would be passed next Tuesday.
 "Mr. Jansen, however, states that the advertisement which appeared in 1934 does not meet the requirement of the Act and that if anyone contested the transaction it would probably be declared illegal.
However, he says he will advise the Board that this is not their concern and that they should go ahead and pass the resolution as presented."
(Emphasis added.)[1] As suggested in the letter, the Board did pass the resolution.
West Dauphin had already presented a similar request to the Alabama State Docks Commission earlier in 1938. As a result of that request, the State Docks Commission, on October 15, 1938, issued the following "certificate of approval":
 "Application having been made to the Commission for approval of a shore line for filling, reclamation and improvement of marsh lands and shallow waters in Dauphin Bay under Act No. 147, approved October 26, 1932 (Acts, Ex. Sess. 1932, p. 167), and it appearing that formal action is desirable in order to make provision for the waste of material proposed to be dredged in the construction of a channel through Pass Drury and Dauphin Bay to the U.S. Government Dredged Channel in Mississippi Sound, a part of which material will be wasted upon lands to be conveyed to the State and a part upon other property, and that the reclamation of marsh lands and shallow waters within the area proposed will be in furtherance of health and otherwise in the public interest, and it being made to appear that notice of intention to apply for the authority contemplated by said Act was published in the Mobile News-Item and the Mobile Times on June 23, 1934, and that no objections to the grant of such authority have been heard; it is
"RESOLVED, by the State Docks Commission that that certain certificate of approval presented at the meeting of said Commission held this 14th day of March, 1938, and identified by certificate of the Secretary thereon be and the same is hereby approved and its execution and delivery for and in the name of the Commission be and the same is hereby authorized and directed; this Certificate of approval shall be effective when approved by the Governor of the State.
 Certificate of Approval
"KNOW ALL MEN BY THESE PRESENTS, That, Whereas, application has been made for authority to fill, reclaim, or otherwise toimprove, own and dispose of marsh lands and shallow waters oftide and submerged lands along the shores of Dauphin Bay and Bigand Little Dauphin Islands, in Mobile County, along and within the improvements lines set forth or described on the exhibits hereto attached marked Exhibits A and B, respectively, and made a part thereof, and,
"Whereas, by resolution of the Alabama State Docks Commission adopted March 14th, 1938, it was resolved and directed that this certificate of approval be executed and delivered for and in the name of the Commission, and,
"Whereas, it appears that the conditions of Section 4 of Act No. 147 . . . have been complied with by publication of notice of intent to apply for the authority contemplated by said Act, more than ten days before the date hereof, and that no objections were filed thereto; also that reclamation and improvement within said lines is in the public interest;
"NOW THEREFORE, IN Consideration of the Premises, and of the sum of $1.00 in hand paid, the receipt whereof is hereby acknowledged, approval and authority is hereby granted to the owners of riparian lands within and behind said lines, extended at right angles thereto, to fill in, reclaim, or otherwiseimprove all tide lands and submerged lands abutting or in frontof their respective riparian holdings and within said linesdefined and extended as aforesaid and own, use, mortgage *Page 950 and convey the same, subject to the following conditions:
 "Any improvement created hereunder shall conform to any harbor line established at the time of the improvement by State or Federal authority having jurisdiction over such matters, or if not then established, same shall conform to any harbor line stipulated by any such authority having jurisdiction on application by such riparian owner.
 "TO HAVE AND TO HOLD unto the respective riparian owners, their heirs and assigns forever, in all respects as contemplated by said Act No. 147, but without warranty or representation on part of the undersigned.
 "Exhibits A and B hereto attached are hereby stipulated and approved as to the improvement lines shown and described thereon. Acknowledgment is hereby made of a grant of lands to the State for park purposes and other valuable consideration by [West Dauphin], contemporaneously herewith, in consideration in part for this certificate and approval as to all riparian lands owned or to be owned by said [West Dauphin], its successors and assigns."
C.R. at 1728-1728A (emphasis added).
Permission to do so notwithstanding, it is undisputed that West Dauphin never actually undertook any of the reclamation activities addressed in this "1938 Certificate of Approval."[2]
West Dauphin contends, nevertheless, that it sufficiently complied with § 33-7-53 to acquire title to the Improvement Line Property. It contends that its June 23, 1934, Mobile Times
publication of "Notice of Application for Establishment of Harbor Line on Dauphin Island," followed by the October 15, 1938, certificate of approval from the State Docks Commission, was sufficient to invest West Dauphin with title to the Improvement Line Property. In order to arrive at that conclusion, West Dauphin construes § 33-7-53 in the following manner.
It argues that the procedures whereby a riparian land owner may acquire offshore property pursuant to § 33-7-53 depend on whether ¶ 3 or ¶ 4 applies. West Dauphin points out that ¶ 3 speaks expressly of the construction of a bridge or similar structure.[3] It concedes that under ¶ 3, title vests in the riparian land owner when he (1) secures permission from necessary authorities, and (2) actually builds the structure "pursuant to the plans so approved."
However, West Dauphin contrasts ¶ 3 with ¶ 4, which, again, states:
 "If such improvement constructed or proposed shall not consist of a bridge, bridgehead, road or causeway, approach or related improvement included within this *Page 951 
section, title shall not pass to the riparian owner making or proposing such improvement unless and until the riparian owner shall have obtained the approval of the county commission of the county in which the land is situated, and of the Director of the State Docks Department and the Governor of Alabama, on application of such owner made after publication of 10 days' notice thereof by a single publication in a newspaper published in the county in which the land is situated and shall have filed for record in the county a certificate of such approval executed and acknowledged by the presiding officer of said respective authorities."
(Emphasis added.) West Dauphin contends that the procedures for acquiring the Improvement Line Property are governed entirely by ¶ 4, which, it argues, merely requires (1) publication of intent to make the improvements, and (2) the filing of a "certificate of approval" procured from the necessary authorities. Thus, it says that, under ¶ 4, "title could pass . . . to an owner who actually made improvement or to an owner who proposed to make improvements.' Brief of Appellants, at 14 (emphasis in original).
The State, however, contends that the acquisition of the Improvement Line Property requires compliance not only with ¶ 4, but, also, with ¶ 1. Indeed, it argues that ¶ 1 is thecontrolling paragraph of § 33-7-53, because, it argues, ¶ 1 is the only paragraph that "purports to grant anything." Briefof Appellees, rat 20. The State construes ¶ 1 as "provid[ing] that the owner of the adjacent lands can `fill in, reclaim or otherwise improve' the adjacent submerged lands and [can] then `own, use, mortgage and convey the lands so reclaimed, filled orimproved and any improvement thereon, under and subject to theconditions and approval herein stated.'" Brief of Appellees, at 20 (emphasis by appellees). Thus, it says that ¶ 1 must be read in conjunction with the rest of the statute to mean that title does not pass to the riparian owner under ¶ 4 unless,and until, it actually makes the intended improvements; that ¶ 1 "cannot be reasonably construed to mean that title to State owned land can be acquired merely by obtaining two certificates of approval without doing anything else." Brief ofAppellees, at 22. The State argues that "the provision in [¶] 4 allowing the prior approval of the improvement simply provides a means for the adjoining landowner to obtain the required approvals before constructing the improvement so that the landowner can avoid the risk that he might construct an improvement and then be unable to obtain the approvals." Brief ofAppellees, at 22-23 (emphasis in original).
We find the State's construction of § 33-7-53 more persuasive than West Dauphin's. There is some basis, albeit by way of analogy, for a construction consistent with the State's. We find no basis for West Dauphin's construction.
In particular, we note that under well-established principles of Alabama law, a riparian owner can in some situations acquire title to submerged lands by artificial filling. O'Dell Howorth,Alabama Tidelands After Phillips Petroleum v. Mississippi: Timeto Reinvigorate the Public Trust, 20 Cumb. L.Rev. 365, 378 (1990). This process has also been termed "streamlined accretion" or "reclamation." State v. Gill, 259 Ala. 177, 183, 66 So.2d 141,145 (1953). There is a caveat to that principle, however, namely, that in order for title to vest in the riparian owner, the reclamation must have been accomplished by one other than theowner, without the owner's permission or participation. Reid v.State, 373 So.2d 1071, 1074 (Ala. 1979) ("the owner of the `fast' or `upland' may not acquire title by [himself] filling the land"); United States v. Turner, 175 F.2d 644 (5th Cir.), cert.denied, 338 U.S. 851, 70 S. Ct. 92, 94 L.Ed. 521 (1949); City ofMobile v. Sullivan Timber Co., 129 F. 298 (5th Cir. 1904). "Simply put, . . . man-made accretion not caused by the hand of the riparian owner will be deemed to be property of the riparian owner." O'Dell Howorth, supra, at 378-79 (emphasis in original).
Consideration of these rules is relevant to our analysis in this case for the following reasons. Clearly, if West Dauphin had actually filled in the Improvement Line Property unilaterally
— without the benefit of § 33-7-53 — it would have acquired no title to *Page 952 
the land. Thus, there is a basis to assume that the Legislature intended, through § 33-7-53, to provide a means by which West Dauphin could, for the special purposes expressed in the statute, upon securing permission, acquire title by such filling or artificial accretion. We have no reason, however, to assume that the Legislature intended to authorize the acquisition of Alabama's valuable tidelands simply by the publication of an expression of desire for them. In other words, there is some
foundation in the law for acquisition by reclamation — analogous to the requirement in § 33-7-53, ¶ 1, that the riparian owner "fill, reclaim or otherwise improve . . . the abutting submerged land." But we know of no foundation in the law for acquisition by stasis, that is, by doing nothing. We conclude, therefore, that the mere publication of an intention to effect, as it were, an artificial accretion does not satisfy § 33-7-53.
This conclusion interprets the intent of the Legislature in a manner consistent with the public trust in which the State holds Alabama's tidelands.[4] Moreover, it is consistent with well-recognized principles of statutory construction. Specifically, "[i]n construing a statute, the court must look not only to the language of the statute, . . . but also to the purpose and object of the enactment, and its relation to other laws and conditions which may arise under its provisions." Siegelman v. Folmar, 432 So.2d 1246, 1249 (Ala. 1983). "Statutes in derogation or modification of the common law are strictly construed. . . . Such statutes are presumed not to alter the common law in any way not expressly declared. Pappas v. City of Eufaula,282 Ala. 242, 210 So.2d 802 (1968)." Arnold v. State, 353 So.2d 524,526 (Ala. 1977) (emphasis added).
We agree with the State that § 33-7-53 requires not only the publication of an intent to "fill in, reclaim or otherwise improve the abutting submerged land," § 33-7-53, ¶ 1, but the actual accomplishment of the published intent. Paragraph 1 includes more than a mere statement of legislative intent-it provides the overarching framework within which ¶ 3 and ¶ 4 must operate and to which they must conform. Although the phrase in ¶ 3 — "when improved pursuant to such approval the title to the said lands and the entire improvements thereon shall vest in such riparian owner" — may serve some logical purpose, the repetition of such a phrase in ¶ 4 wouldclearly have been redundant. Therefore, the Legislature excluded it. For these reasons, West Dauphin did not acquire title pursuant to § 33-7-53.
 II. Public Dedication
West Dauphin also contends that it acquired title to the Improvement Line Property by a land exchange. More specifically, it argues that it dedicated property on Dauphin Island in 1954 in exchange for the Improvement Line Property. The history of this "exchange" also begins in the 1930s.
As the October 15, 1938, Docks Commission "certificate of approval" illustrates, West Dauphin had been negotiating with the State for the transfer of some of West Dauphin's property to the State. This transfer was to be made in exchange for certain action by the State. First, the transfer was conditioned upon approval by the necessary government authorities of the requested "harbor line for reclamation purposes." C.R. 1025. Second, the transfer was conditioned on the commencement of the DauphinIsland Bridge and the State's provision of "the funds [necessary to] bring about the construction . . . of a paved road from the point on the Mobile-Cedar Point Road . . . to the bridge head." C.R. 1026. More specifically, in a letter dated September 8, 1937, West Dauphin wrote:
 "With reference to our letter dated August 23, 1935 wherein you were designated escrow agent of a deed to the State of Alabama conveying certain property on Dauphin Island, Alabama, under certain terms and conditions as outlined in said letter, this will certify that by proper resolution of the Board of Directors of [West Dauphin], said letter and agreements have been modified so as to provide that: If the *Page 953 State of Alabama builds the bridge to Dauphin Island or if any other person, firm or corporation builds said bridge without the aid of the Public Works Administration, the same covenants and agreements contained in said letter dated August 23, 1935, and the extension endorsed on our letter on August 10, 1937 shall be in full force and effect. In other words, if the State of Alabama or any other person, firm or corporation builds the bridge, commences work on said bridge on or before November 1, 1937 and carries it to completion and the State of Alabama carries out the covenants and agreements as contained in our letter of August 23, 1935, the agreements and covenants of [West Dauphin] as contained in said letter shall be fully binding."
C.R. at 1043 (emphasis added). Indeed, a series of transactions began in 1935, spanning approximately 20 years, pursuant to which West Dauphin placed in escrow various deeds purporting to convey land to the State "pending approval of a bridge construction loan and other conditions." Brief of Appellants, at 10.
However, the conditions under which West Dauphin proposed to convey the property remained unmet for several years. Specifically, West Dauphin states:
 "The ongoing efforts between 1935-50 by the West Dauphin Defendants' predecessors to convey land to the State for public use and/or to dedicate land on Dauphin Island for public use were apparently frustrated because the State was unable during that time to successfully arrange for the construction of the Dauphin Island Bridge."
Brief of Appellants, at 11. Consequently, none of the deeds placed in escrow was delivered, and these transactions with the State were never consummated.
On March 9, 1954, the State entered into an agreement with Mobile County, whereby the State would construct the Dauphin Island Bridge "for account of the County." C.R. 1389. It was to be financed with "bridge revenue bonds appropriately secured from the tolls and fees required to be charged on its use." C.R. 1350.
That same agreement acknowledged that construction of the bridge was being encouraged by the Mobile Chamber of Commerce, which purported to have "an option to purchase the major portionof the land area of Dauphin Island in Mobile County, Alabama, . . . suitable for residential development and the establishment and development of public parks, bathing beaches and other public areas." (Emphasis added.) The Mobile Chamber of Commerce further stated that it had "caused the land area of said Dauphin Island so under option to purchase by it to be surveyed, platted and subdivided and [had] by such subdivision plat provided in the public interest adequate public parks, bathing beaches, and other public areas."
As we understand West Dauphin's argument, some, or all, of this "option" land was land the Mobile Chamber of Commerce had received by donation from West Dauphin. More specifically, West Dauphin states: "Finally, after the intervention of the Mobile Chamber of Commerce, on February 16, 1954, the former shareholders of [West Dauphin] delivered to the Chamber the 1953Subdivision Plat of Dauphin Island. The plat formally dedicatedfor public use a large amount of land on Dauphin Island." Briefof Appellants, at 11 (emphasis added). Also, it states:
 "Before the State built a bridge to the island, it understandably wanted some assurance that there would be a reason for people to go there. And that assurance is exactly what the West Dauphin Defendant's predecessors helped provide with the 1954 dedication. That dedication was part of the same process which gave rise to the 1938 certificates of approval conveying the [Improvement Line Property] to [West Dauphin]. The [Improvement Line Property] was part of what the West Dauphin Defendant's predecessors received in exchange for their cooperation in the efforts to develop the island. Now the State is attempting to deprive the West Dauphin Defendants of that property."
Reply Brief, at 15. Indeed, West Dauphin contends that if it does not now own the Improvement Line Property, then the "property which [its] predecessors dedicated to *Page 954 
public use in 1954 has been unconstitutionally taken without just compensation." Brief of Appellants, at 20. It is undisputed that, from 1954 until now, ad valorem taxes on the Improvement Line Property have been assessed to, and paid by, West Dauphin.
Apparently, a factual dispute exists regarding the receipt, if any, of compensation for the dedication. The State contends that West Dauphin received approximately $1 million from the Mobile Chamber of Commerce in return for the dedication. Thus, the State contends that West Dauphin has been justly compensated. We need not, however, determine the source or the purpose of the alleged $1 million payment, because there is, otherwise, a fatal flaw in West Dauphin's argument.
The flaw is that West Dauphin cannot demonstrate an unbroken chain of events evidencing a consummated, quid pro quo
transaction with the State — or any other entity —involving the Improvement Line Property. It is undisputed that none of the deeds by which West Dauphin proposed to exchange Dauphin Island property for the Improvement Line Property was ever delivered. When, in 1954, West Dauphin at last divested itself of some Dauphin Island real estate, it was in favor, not of the State, which owned the Improvement Line Property, but of the Mobile Chamber of Commerce, which had no control over the Improvement Line Property. We know of no document to which West Dauphin and the State are parties whereby the State agreed to exchange the Improvement Line Property for West Dauphin's dedication of certain property for public use. Thus, whatever might have been the contents of the agreement between West Dauphin and the Mobile Chamber of Commerce that resulted in the dedication of West Dauphin property, it could not have involved the Improvement Line Property or bound the State, because the State was not a party to that agreement.[5] In short, West Dauphin never consummated an agreement with the owner of the Improvement Line Property for an exchange of property; the property West Dauphin dedicated to public use did not vest in theState; and the Improvement Line Property did not vest in West Dauphin.[6]
 III. Estoppel
Finally, West Dauphin contends that the State is estopped to assert its ownership of the Improvement Line Property. This is so, West Dauphin argues, because, since the 1954 dedication, West Dauphin has paid ad valorem taxes on the Improvement Line Property. This argument is without merit.
"It is a well settled principle of law that title to governmentproperty may pass only in the manner prescribed by the duly constituted legislative body. . . ." State v. West,31 N.C. App. 431, 441, 229 S.E.2d 826, 831 (1976) (emphasis added), aff'd,293 N.C. 18, 235 S.E.2d 150 (1977). Moreover, "title to any such property may not be forfeited through the oversight, carelessness, negligence, or even intentional conduct of any of the agents of the government. . . . This legal principle applies to government land, personal property or public records."31 N.C. App. at 441, 229 S.E.2d at 832 (emphasis added). "The underlying rationale of this rule is that property owned by the government is held in trust for the people and that the intentional or negligent acts of the agents of the government should not serve to deny the people of the benefits and enjoyment of `their' property." Id. at 441-42, 229 S.E.2d at 832. SeeNorman v. State, 182 Mont. 439, 446, 597 P.2d 715, 719 (1979) (estoppel may not be *Page 955 
asserted against the State "where it would interfere with the protection of the public's interest in lands"); State v. DakotaCounty, Neb., 250 Iowa 318, 325, 93 N.W.2d 595, 599 (1958) ("mistakes of officials cannot deprive a State of its property");Bartholomew v. Staheli, 86 Cal.App.2d 844, 857, 195 P.2d 824,832 (1948) ("property owned by the state is held in trust for the people of the state, and may not be lost or abandoned through the negligence of its officers or agents"); see also State ex rel.Martin v. City of Gadsden, 216 Ala. 243, 246, 113 So. 6, 8 (1927) ("laches or neglect of duty on the part of officers of government . . . is no defense to a suit by it to enforce a public right or protect a public interest").
In this case, the State asks: "Why should the State of Alabama lose title to its sovereign trust lands because a clerk in the local tax assessor's office happened to fill out an assessment sheet requested by a claimant and the tax collector accepted payments based on that assessment?" Brief of Appellees, at 34. It then states:
 "Obviously, a tax clerk is not in a position to resolve weighty and complicated legal issues and questions of statutory interpretation involving title to particular property, and, thus, a clerk's erroneous decision to assess certain property in the name of a person claiming title does not represent a calculated decision by the State of Alabama in its sovereign capacity. Indeed, a rule that allowed title acquisition against the State in this fashion would create a clear opportunity for abuse, especially in cases such as the one presently before the Court where the taxpayers (the West Dauphin Defendants) readily admit that they affirmatively initiated the steps needed to get the property at issue assessed to them in 1954 even though their only possible claim to the title was based on the above-discussed defective `certificates' which were dated 16 years earlier."
Id. We agree with these observations.
Therefore, although estoppel may, in rare circumstances, be applied against the State, Ex parte Four Seasons, Ltd.,450 So.2d 110, 111 (Ala. 1984), we have no difficulty in holding that a party may not acquire title to Alabama's valuable tidelands by estoppel, based on the erroneous assessment and collection of advalorem taxes. Indeed, in State ex rel. Attorney General v. Ward,272 Ala. 646, 653, 133 So.2d 383, 390 (1961), this Court held that neither (1) the "[a]cquiescence by the state in the possession of . . . lands under [a] tax deed for approximately 50 years," nor (2) "[t]he assessment and collection of taxes upon the lands for more than 50 years" estopped the State from asserting its ownership of property in possession of a private party.
 Conclusion
We conclude that the trial court properly entered the summary judgment in favor of the State. That judgment is, therefore, affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, and LYONS, JJ., concur.
SEE, J., concurs in the result.
[1] Like Mr. Jansen, we have serious doubts about the efficacy of the publication. Because we resolve this dispute on other grounds, however, we offer no further comment on that issue.
[2] West Dauphin's aspirations are more fully explained in its brief as follows:
 "The resolutions which the Docks commission and the Board of Revenue and Road commissioners adopted when they approved the certificates specifically referred to the proposed dredging of a channel through Pass Drury and Dauphin say and that formal action was desirable in order to make provision for the waste of material that would result from that project. And, if fact, in 1938 there was a specific proposal made by the U.S. Corps of Engineers to dredge the channel referred to in the resolutions. Moreover, in 1938 [West Dauphin] had also applied to the State for permission to dredge at Dauphin Island. In a letter to Governor Graves . . ., S.P. Gaillard of the Docks commission advised the governor that [West Dauphin] had applied for permission to dredge on Dauphin Island and that `several million cubic yards of dirt will have to be moved to fill in all of the property included within the proposed harbor line.' It is therefore apparent that the West Dauphin defendants proposed to fill in the Harbor Line, Property with waste material from their own dredging operations and/or from the dredging of the proposed Dauphin Island channel by the Corps of Engineers." Brief of Appellants, at 8-9 (emphasis added).
[3] To reiterate, ¶ 3 provides:
 "If such land shall be used for a bridge, road or causeway over navigable waters, or for bridgehead or approach thereto or for terminal facilities, depots, storage or sale yards, stores, warehouses or wharves abutting on such bridge or road or causeway, the plans for such bridge, road or causeway shall be approved by the United States engineer officers or other federal authority having jurisdiction, and by the Director of the State Docks Department and the Governor of Alabama, and when so approved and when improved pursuant to such approval the title to the said lands and the entire improvements thereon shall vest in such riparian owner without further approval when the bridge, road or causeway shall be constructed pursuant to the plans so approved."
(Emphasis added.)
[4] "The ownership by the state of the shores and beds of navigable streams is a trust of a most solemn character for thepublic . . . ." Mobile Transp. Co. v. City of Mobile, 153 Ala. 409,414, 44 So. 976, 977 (1907) (emphasis added).
[5] The Mobile Chamber of Commerce is not a party to this action.
[6] West Dauphin's property-exchange argument significantly weakens the argument it advanced that is discussed in Part I of this opinion, namely, that it acquired the Improvement Line Property through compliance with § 33-7-53. This is so, because, if West Dauphin actually believed it had acquired the Improvement Line Property through the statutory procedure in 1938, it would not logically have engaged in negotiations until 1954 for the "purchase" of the same properly through an exchange agreement.
Moreover, West Dauphin concedes that the 1954 dedication was made in "cooperation [with] efforts to develop the island." ReplyBrief; at 15. It is unrefuted that West Dauphin's property values increased because of the construction of the Dauphin Island Bridge, which construction West Dauphin credits, at least in part, to the intervention of the Mobile Chamber of Commerce. In this way, of course, West Dauphin has been compensated for its dedication.